## PEOPLE *v.* WILLSON.

1. CRIMINAL LAW—FRAUD—PUBLIC OFFICERS—INTENT—BURDEN OF PROOF.

> In a prosecution, under section 15308, 3 Comp. Laws 1915,. charging defendant, the supervisor of a township, with having falsely and fraudulently reported a wrong valuation of his township to the board of supervisors and its committees of equalization, the burden of proof rested upon the prosecution to prove criminal intent.

2. SAME—FRAUD—EVIDENCE—ADMISSIBILITY.

> Where the principal issue is fraud, or fraudulent intent, a. wide latitude is recognized in receiving evidence of facts. tending either to inculpate or exculpate the party accused.

3. SAME—EVIDENCE—ADMISSIBILITY—INTENT.

> Testimony in support of the theory of the prosecution that the township treasurer was a defaulter, which fact was presumably known to defendant because the township board of which he was a member had audited and certified the treasurer's records as correct, and that defendant's false report of valuations was made designedly to create a surplus fund for the township to replace or cover up the shortage was admissible only to aid in determining the motive or guilty knowledge and intent in the crime charged.

4. SAME—TRIAL—READING STATUTES—EVIDENCE.

> Reading by the prosecution to the jury certain statutes which were irrelevant and immaterial even for the court to consider, which were no evidence for or against any fact in dispute, and which only tended to bewilder and confuse the jury, *held*, reversible error.

5. SAME—TRIAL—INSTRUCTION—EVIDENCE—OTHER OFFENSE.

> An instruction by the court allowing the jury to take into consideration whether or not there were any shortages. in the account of the treasurer of the township which came to defendant's knowledge, in arriving at a correct conclusion as to whether or not the acts of fraud were actually committed by defendant as charged, *held*, erroneous.

6. SAME—FRAUD—PROOF—GIST OF OFFENSE.

>   To constitute the charged criminal perpetration of fraud against the county under said statute, it is not essential to prove that the municipal corporation, as such, sustained direct pecuniary loss; it being sufficient· to show that defendant knowingly, designedly, and with intent to deceive, falsely reported in his official capacity to the county officers a valuation of his township for assessment purposes less than the true amount, as a result of which excessive and unlawful county taxes were unwittingly imposed upon and collected from that portion of the county outside the township he represented, and which he knew should have been rightfully imposed upon it.

7. SAME — STATUTES — EXAMINATION — WITNESSES — PRIVILEGE — CONSTITUTIONAL LAW.

>   The contention of defendant that a person who is summoned to testify before a court of inquiry or called as a witness in an authorized proceeding for the discovery of crime under Act No. 196, Pub. Acts 1917, and there gives testimony, whatever its nature, is thereafter immune from a prosecution based on information obtained during such inquiry, from whatever source it came, cannot be sustained.

Exceptions before judgment from Oakland; Rockwell, J. Submitted January 16, 1919. (Docket No. 114.) Decided April 3, 1919.

Albert W. Willson was convicted of making a false report with intent to cheat and defraud. Reversed.

*Pelton & McGee* and *A. L. Moore,* for appellant.

*Glenn C. Gillespie,* Prosecuting Attorney, and *James H. Lynch,* Assistant Prosecuting Attorney, for the people.

STEERE, J. Respondent brings this case here for review before sentence on his conviction in the circuit court of Oakland county under an information charging him with having as supervisor of the township of Royal Oak falsely and fraudulently reported a wrong valuation of that township to the board of supervisors

and its committees of equalization at the June and October, 1916, sessions thereof with intent to defraud and cheat the county of Oakland and its taxpayers.

The township of Royal Oak, containing a village of the same name, lies near and just north of the city of Detroit, and was roused from its previous rural quiet by an invading demand for real estate at greatly enhanced values with a feverish haste to plat the same as suburban property of Detroit to meet the existing or anticipated demand which took place in the environments of that city from 1915 to 1917. Respondent was supervisor of Royal Oak township during that time and as a result of this so-called "real estate boom" the assessment roll of Royal Oak township, which consisted of 137 pages in 1912, grew to 1,600 pages in 1917. In 1915, when respondent was elected supervisor of that township, he established his office in his house, hiring a young lady by the name of Dorothy Smith as clerk, assisted at week ends by his own son who was attending school at Ypsilanti. At the January, 1916, session of the board of supervisors he ordered four books of 200 pages each for his 1916 assessment roll and later, discovering it was not sufficient, ordered another book of 250 pages, after the spring election of 1916. During the summer of 1916 the Detroit real estate boom which had spread over that section resulted in such hasty platting of subdivisions that there were upon the assessment roll of that year about 84 more plats than the previous year, with approximately 17,400 more descriptions. The township board consisted of respondent, as supervisor, Mr. Blair, its clerk, and two justices of the peace whose offices would soonest expire, named Grow and Wheeler. Wheeler was a paralytic and took little, if any, part in public matters; Grow's term of office expired in July, 1916, and though re-elected he did not qualify. Respondent and Blair were the only active members

of the board looking after the township's affairs. Blair maintained an office in the township hall where his clerical duties appear to have occupied most of his time. Respondent attempted to look after the general township business, which under existing conditions required investigation of plats, opening of streets, railroad crossings, drains and other matters of like nature involving public interests. The clerical work of his office was apparently given little attention by him and with his scant clerical force fell behind, if not into confusion.

Apparently owing to rumors afloat and confusion in township affairs, H. E. Miller, the incoming treasurer in 1917, succeeding a treasurer named Mark Halsey, refused to take over the township treasurer's books and responsibilities until an audit was had, but finally assumed the duties of the office after giving a receipt for the amount of money actually turned over to him. Later the township board by official action procured the services of a trust company of Detroit to conduct an audit of the township books and records. An audit was thereafter made by a certified public accountant in the employ of the trust company who completed his work in September of that year and made a report, three copies of which respondent directed should be delivered to him. They were mailed to Mr. Blair, the township clerk, from whom respondent secured two copies shortly thereafter, one of which he retained at his home and the other he delivered to his attorney who was then acting as attorney for the township. Except the respondent claims to have discussed the matter with his counsel the township officials seem to have done nothing further until February 11, 1918, when the prosecuting attorney of Oakland county took the matter up and first endeavored to have something in the nature of an amicable investigation before the township board

with a stenographer present, to whom defendant's counsel, who was in attendance as attorney for the township, objected and the prosecuting attorney withdrew. Having obtained a copy of the auditor's report the prosecuting attorney then instituted an investigation before a justice of the peace of Pontiac, based chiefly upon the report, the inquisitorial proceedings being taken under Act No. 196 of the Public Acts of 1917. As a result of that investigation criminal proceedings were instituted against respondent for malfeasance in office in various particulars and he was ultimately arraigned in the circuit court upon an information charging fraudulent official misconduct as stated, to which he refused to plead and a plea of not guilty was entered by the court in his behalf, followed by trial and verdict of conviction.

Defendant's bill of exceptions presents 47 assignments of error involving numerous dilatory proceedings by motion for change of venue, motions to quash the information, motions for continuance, etc., in which no reversible error is found, while certain others, based on objections raised during the trial, are unfortunately not properly presented because obscured by facts asserted in their support which do not appear in the record and for that reason are not entitled to consideration.

This information is filed under section 15308, 3 Comp. Laws 1915 (being section 27 of chapter 257, entitled "Offenses against Property"), which provides:

"If any officer, clerk or other person, employed in the treasury of this State, or in the treasury of any county, or in any other public office within this State, shall commit any fraud or embezzlement therein, he shall be punished by imprisonment in the State's prison," etc.

The specific criminal act with which respondent was charged and for which he was tried under this statute

is, concisely stated, perpetrating a fraud upon the county of Oakland in the fall of 1916 while supervisor of Royal Oak township and a member of the board of supervisors of said county by "falsely and fraudulently" reporting and representing to the board of supervisors that the correct valuation of Royal Oak township according to his assessment roll for that year was $9,832,200, "with intent then and there to cheat and defraud the said county of Oakland and the taxpayers thereof, in that a smaller and lesser proportion of State, county, and county road taxes (for said year 1916) might be apportioned by said board of supervisors to said township of Royal Oak," etc., whereas in truth and fact the correct valuation of his township for that year as shown by the assessment roll thereof was as prepared by him $12,173,280.

The board of supervisors held a meeting in June of that year for the purpose, amongst other things, of equalizing the valuations of the several townships in the county and determining upon a basis for the State and county tax, and a committee of equalization was appointed which proceeded in the performance of its duties to look over the assessment rolls of the various townships and ascertain each supervisor's assessed valuation of his township. Respondent had not near finished making the assessment roll for his township at that time, but attended the meeting of the board, held in Pontiac, taking along his incompleted assessment roll consisting of five volumes. Three of these were practically completed, the fourth but partially, with very little done upon the fifth which, when done, included practically all the property in Royal Oak village and so far as completed but part of the volumes had been footed in lead pencil. No definite statement of valuation could be reached from this uncompleted roll. Respondent testified he stated to the chairman

of the board of equalization with whom he advised that he did not know what it would amount to. There were 25 townships in the county and five wards in the city of Pontiac to equalize the assessment of and after talking the matter over, the chairman of the board asked respondent to give him something showing the total valuation of his township for the committee to use. He went home that night and from such totals as he had in his office with estimates from plats, the roll of the preceding year, etc., he, with the assistance of his clerk, Miss Smith, made an attempted computation of the valuation showing about $9,200,-000, a memorandum of which, in her handwriting, he gave to the chairman of the equalization board the following day. This was then taken by the committee as his report and so used in proceeding with its work.

At the annual meeting of the board of supervisors in October, 1916, the committee on equalization completed its work but did not go over the rolls again or ever attempt to total the Royal Oak township assessment roll. The chairman asked respondent for the total amount of his roll, or whether there was any change in the valuation figures, and he replied there had been an increase and stated an amount. $3,600 was then added to his roll in the equalization. Respondent claimed the amount he stated to the chairman was $36,000 instead of $3,600, and that he did not notice the mistake when the report of the committee was approved.

After the June session of the board certain property previously listed as acreage was platted; it is claimed to have been discovered that the Burroughs adding machine used in respondent's office was out of order to such an extent as to sadly bewilder the clerical force for a time, making a large difference (variously stated as $200,000 and $800,000) in the school district valuations alone, and in fine whether through

incompetency and unintentionally or with criminal intent to defraud the county, which was the issue involved on the trial, it subsequently developed that respondent's valuation upon his tax roll exceeded by over $2,000,000 that accepted and acted upon by the board of supervisors as reported by him to the committee on equalization.

It appears that neither the board of supervisors nor its committee on equalization examined all the assessment rolls of the several townships to determine the relative valuations and accuracy of the footings in making up the equalization and apportionment for the county, as required by statute and in respondent's case at both its meetings simply accepted his memorandum of estimate and oral statements as to valuations. He testified that he tried to get a hearing before the committee to explain the situation but was not given opportunity to do so; but in any event it appears undisputed that acting on the information obtained from him the board as a basis of equalization determined the valuation of Royal Oak township at $9,832,200; and the rate spread and computed upon the individual valuations of the various parcels of property upon the assessment roll of the township of Royal Oak for that year resulted in a collection of about $12,000 more money in that township than was required to settle for the State and county taxes, which surplus was retained and distributed among the several funds of the township.

It is conceded by the defense that this result is attributable to the discrepancy between the valuation of the township for equalization determined by the board from respondent's oral report and its actual valuation for assessment purposes as shown by his assessment roll. It is also admitted by the prosecution that respondent is not shown to have embezzled, received or, directly at least, profited by any of this

surplus which was distributed to the several township funds. In reply to an inquiry by a member of this court as to whether it was claimed respondent in any manner profited by this transaction, counsel for the prosecution answered in the negative, stating in substance that it was not shown or claimed respondent had actually received any portion of the money.

With these concessions on the respective sides, which the record fully bears out, the controlling issue in this criminal prosecution centers to a question of criminal intent, or the constructive purpose of the act, incidental to which is that of motive. The same results would follow between the township and county whether this incorrect report by respondent to the board of supervisors was an innocent mistake resulting from incompetency or confusion of accounts and records, or was designedly made incorrect and false with a sinister and criminal intent to deceive and defraud.

It was conceded by the prosecution that the erroneous information communicated by respondent to the chairman of the committee on equalization at the June meeting of the board of supervisors was in the nature of an estimate, and no criminality is charged against him as to that transaction. The charge of fraud perpetrated with criminal intent is directed to his replies and report at the October meeting. Not denying the charged incorrect report it was contended by and for defendant that it was an honest mistake innocently made under the confusing press of rapidly increasing duties and enhancement of values without thought, or realization, of any resulting benefit to himself. The burden of proof rested upon the prosecution to prove criminal intent and motive, to which end various official books and records of Royal Oak township kept during defendant's incumbency were put in evidence and his official conduct in township affairs was gone into at length, interspersed with numerous objections

and claims of the respective parties which it is not necessary or practical to detail at this time. Where the principal issue is fraud, or fraudulent intent, a wide latitude is recognized in receiving evidence of facts tending either to inculpate or exculpate the party accused and many of defendant's objections seem to ignore that principle.

We are, however, impressed that undue latitude and emphasis was permitted in the range over certain collateral inquiries and issues, to a confusing extent prejudicially tending against a fair and unbiased determination of the one controlling issue of fact for the jury. In the absence of proof of personal profit or benefit, it was the theory of the prosecution that motive and criminal intent were made manifest by proof of a shortage in the accounts of the township treasurer, presumptively known to respondent because the township board of which he was a member had audited and certified as correct the treasurer's records, and that respondent's false report of valuations to the board of supervisors was made designedly to create by the actual valuation a surplus fund for the township to replace, or cover up, the treasurer's shortage. This charge was centered upon the books and records of the treasurer's account for 1916, one Halsey being then township treasurer. His books as kept showed a shortage for that year and it was charged he was a defaulter. While it is not shown that respondent had anything to do with keeping these books, and he is not prosecuted for conspiracy in connection with the shortage, this exceptional collateral proof of another offense by another party is permissible only under the wide latitude of inquiry allowed where the issue is fraud, to aid in determining motive, or guilty knowledge and intent in the crime charged, and should be guardedly restricted to that single purpose. The audit of the books and records of the township, made by

authority of the township board, was begun in May, 1917, and concluded some time in the fall of that year. On October 6, 1917, the manager of the accounting department of the trust company employed to make the audit wrote respondent that the report would be ready for delivery in a few days "and we will have three copies for your use." This report figured conspicuously in the trial, being identified and explained by the accountant of the trust company who conducted the audit and testified that the sources of the information which it contained were the township clerk's and treasurer's books and records, tax rolls, county treasurer's records, etc. This audit showed a book shortage in the accounts of four treasurers of Royal Oak township, testimony being admitted during the trial along that line, against objection, running back as far as 1910. While it was claimed by the defense that the apparent book shortages were attributable to imperfect bookkeeping and no actual shortage existed, which defendant's counsel complain they were not allowed to fully go into (failing, however, to point out any definite ruling in the record to that effect), it is sufficient to note without further discussion of those contentions that the permitted range of inquiry drew into the case several collateral issues of confusing tendency; and the testimony for the jury to consider was further blended and burdened in a somewhat novel manner by counsel for the prosecution, while putting in their testimony, introducing as evidence and reading to the jury by permission of the court, against defendant's objection, some ten pages (by the record) of the Michigan statutes prescribing the time and manner of levying, assessing and collecting taxes, and the multitudinous duties of the various township, county and State officers in that connection. No question was raised in the case as to defendant's duties. It was the province of the court to deal with the law and instruct

the jury as to the charge contained in the information, which was filed under a different and distinct statute, and upon their distinct functions in deciding the issues of fact raised by conflicting testimony. These statutes were largely irrelevant, and immaterial in their legal aspect even for the court to consider, and certainly were not evidence for or against any fact in dispute. Reading them to the jury as evidence could serve only to confuse and bewilder.

Various errors are assigned against the charge which is claimed to be argumentative and prejudicial in designated particulars not requiring discussion here, beyond an assignment involving the testimony relative to the township treasurers' shortages. In one portion of the charge the court told the jury that:

"As bearing on the question of respondent's good faith in his action in reporting the valuation of his township to the board of supervisors, at their October session, you may take into consideration whether or not there were any shortages in the account of the township treasurer of Royal Oak in 1915 and 1916, which came to respondent's knowledge."

And later in the charge instructed the jury that—

"The prior and subsequent circumstances were admitted only for the purpose of aiding you in arriving at a correct conclusion as to whether or not the acts of fraud were actually committed as alleged in the information."

The question of whether any or all of the township treasurers were short in their accounts constituted in itself an independent collateral matter which at that time had not been judicially determined. The law is well settled that it would be error for the trial court to instruct the jury they might consider a collateral offense, even by the respondent himself, as evidence of the fact or substantive act of the offense charged. *People* v. *Thacker,* 108 Mich. 652; *People* v. *Giddings,*

159 Mich. 523 (18 Ann. Cas. 844; *People* v. *Mac-Gregor*, 178 Mich. 436). When the court in its last distinct utterance upon the subject told the jury in general that those prior and subsequent matters relative to township affairs could be used by them in arriving at a correct conclusion as to whether or not the *acts* of fraud were actually committed as charged he, as said in *People* v. *Thacker, supra,* "went farther than any of the cases go, and announced a doctrine that would be exceedingly dangerous to follow," particularly under the condition of the record in this case.

As the verdict must be set aside, and a re-trial granted for the errors noted, it seems advisable to briefly refer to two assignments of error which it is tenaciously insisted entitle respondent to an order of discharge. They are in brief that his counsel's motion to quash the information and later for a directed verdict in his behalf should have been granted because it is not shown or claimed that the county of Oakland "ever suffered a dollar of loss" by reason of the charged fraudulent report; and that because interrogated in the inquisitorial proceedings under Act No. 196, Pub. Acts 1917, as to matters covered by the information against him his statutory and constitutional rights preclude this prosecution.

To constitute the charged criminal perpetration of fraud against the county under the statute it is not essential to prove that the municipal corporation as such sustained direct pecuniary loss. Respondent in reporting the assessed valuation of his township to the board of supervisors was performing an official duty essential to the correct and valid performance of a governmental duty by the county through its official agents in raising public funds for the State and county by taxation. "Fraud" and "bad faith" are often synonymous, and particularly so as applied to the conduct

of a public official. "Fraud" in such connection imports acts, concealments or omissions involving a breach of legal or official duty, trust or confidence imposed, injurious to another or to the public, or any portion of the public toward whom that duty is owed, which results in undue or unconscionable advantage to the official, or those in whose behalf it is perpetrated. We have no hesitation in concluding that if it was shown respondent knowingly, designedly and with intent to deceive, falsely reported in his official capacity to the county, or its board of supervisors representing it, a valuation of his township for assessment purposes $2,000,000 less than the true amount, on the faith and as a result of which $12,000 excessive and unlawful State and county taxes were unwittingly imposed upon and collected from that portion of the county outside the township he represented, and which as he knew rightfully should have been imposed upon it, defendant would be guilty of the statutory fraud charged.

On the investigation into the affairs of the township held under Act No. 196 after the prosecuting attorney had obtained a copy of the auditor's report respondent was one of the many witnesses who were examined. A subpœna was issued for him to appear as a witness and, while a disputed question, it may be assumed was served. Some time before the investigation he was in possession of the auditor's report upon which his prosecution is chiefly based and had delivered a copy to his attorney, retaining one for himself. While the investigation was in progress and before he was called as a witness he had arranged with his attorney that, as he states, "if anything would happen to me * * * he would take the case" and had asked him if he should produce his books and tax rolls at the investigation without being subpœnaed, which the attorney advised him to do. He was told

by the court when on the stand during his trial that he was not obliged to tell what occurred between him and his counsel, but stated he was perfectly willing to, if he could answer in his own way, and was allowed to do so. He produced his books when wanted at the investigation, and when called as a witness made no suggestion that he desired to consult with or have his counsel present, did not suggest to the examiner or presiding justice any objection or desire not to answer the questions asked him, or in any way intimate a reluctance to testify because his answers might tend to incriminate him. In his affidavit filed in the case in support of a motion for continuance respondent stated:

"That during such investigation this deponent had consulted with his attorney, A. L. Moore, who had been his friend, adviser and counsel for years, and who was his trusted friend and adviser."

On the trial when sworn as a witness in his own behalf he stated that when examined at the investigation he supposed he had to answer the questions and when counsel for the prosecution asked him if he then intimated that he did not wish to answer any of them, his counsel objected on the ground that having been summoned by subpœna he was compelled to testify under the provisions of sections 1 and 2 of Act No. 196, irrespective of section 4 of the act. Following this, and in the absence of the jury, respondent's counsel re-examined him briefly before the court upon that subject and, his rights under Act No. 196 having been discussed the court sustained the objection, ruling in substance that the prosecution could not upon the trial show what respondent's testimony was in the preliminary investigation, stating that the ruling was made "in view of this new statute" of which respondent should have the benefit. The jury was then called in and his cross-examination resumed upon

a different subject. We do not find that the prosecution thereafter was allowed, or attempted, to question him as to his testimony on the preliminary investigation or to show what he testified to, either by a stenographer's transcript or otherwise.

Had the prosecution been permitted to prove before the jury incriminating answers given by respondent to questions asked him on the inquisitorial proceedings for discovery under the statute other questions might arise; but what questions were asked respondent when a witness at that investigation or what answers, incriminating or otherwise, he may have made are not disclosed. His counsel's assumption in that particular would seem to be based either on matters *de hors* the record, or a presumption that having been a witness at this investigation for discovery of crime, analogous to a grand jury inquiry, and afterwards prosecuted as the result of information discovered, he must have given incriminating testimony against himself. No such presumption obtains in law, or upon the facts in this case. This investigation of the confused accounts and questionable affairs of the township occupied several weeks, involving a protracted examination of numerous books, rolls, records, accounts, vouchers, etc., of the township officials and many witnesses. As shown by the evidence produced at the trial, the information obtained at the investigation upon which the prosecution was based and the evidence relied upon for conviction was available from other sources and witnesses, which it required no aid or admissions from respondent to secure. Counsel's claim as to respondent's constitutional and statutory rights resolves itself upon this record into the proposition that a person who is summoned to testify before a court of inquiry, or called as a witness in an authorized proceeding for the discovery of crime under Act No. 196, and there gives testimony, whatever

its nature, is thereafter immune from a prosecution based on information obtained during such inquiry, from whatever source it came. Such construction of the act or the constitutional rights of the accused cannot be entertained.

For the reasons stated the verdict must be set aside and a re-trial granted.

BIRD, C. J., and MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred. OSTRANDER, J., did not sit.