456 So.2d 209 (1984)
Lum CUMBEST
v.
STATE of Mississippi.
No. 53799.
Supreme Court of Mississippi.
May 16, 1984.
*211 Frank J. Hammond, Jr., Moss Point, William Liston, Liston, Gibson & Lancaster, Winona, for appellant.
Bill Allain, Atty. Gen. by Marvin L. White, Jr., Special Asst. Atty. Gen., Jackson, for appellee.
En Banc.
HAWKINS, Justice, for the Court:
Lum Cumbest and Dale Coleman were convicted in the Circuit Court of Jackson County of perpetrating a fraud upon Jackson County in violation of Miss. Code Ann. § 97-11-31 and each sentenced to a term of four (4) years in the Department of Corrections, with three (3) years suspended.
Cumbest was supervisor of District Number One, and Coleman was a road foreman of that district.
Coleman did not prosecute an appeal to this Court. Cumbest did.
There are numerous errors assigned, which we will cover in this opinion. We affirm.

FACTS
Miss. Code Ann. § 65-7-95 is one of the statutes governing expenditures of county funds. Originally enacted as Chapter 156, Laws of 1928, it provides the method whereby boards of supervisors construct, repair and maintain county roads and bridges. The statute first provides that the board may purchase equipment and materials and employ labor for such purposes under the direction of a competent road commissioner. The statute then provides that if, in the opinion of the board, any part of the work necessary can best be done by awarding contracts therefore, the board may do so.
By Chapter 260, Laws of 1962, the act was supplemented by a legislative recognition *212 that county boards upon occasion rented heavy equipment for work on roads. The 1962 amendment specifically provides that before any board of supervisors may rent heavy road machinery or equipment, it must first adopt an order adjudicating the necessity for such rental, the purposes for which it is to be used, the type of machinery or equipment, and the reasons why the rental will promote the public interest of the county. There is then a requirement that the order direct the clerk to advertise for bids and provision is made for awarding the contract to the lowest responsible bidder.
By Chapter 513, Laws of 1964, Miss. Code Ann. § 31-7-101 et seq., the Legislature required county boards of supervisors to establish a central purchase system for equipment, supplies, and services necessary for the maintenance, repair and construction of county roads and bridges. This system requires a county purchase clerk responsible for the purchase of such equipment, supplies, and services from the successful bidders or other vendors legally authorized to make such sales.
Under the statutory procedure, a member of the board or duly authorized employee prepares a requisition in triplicate for the product or services needed. Upon receipt of the requisition, the purchase clerk issues a purchase order in quadruplicate for the product. One copy of the purchase order is retained by the purchase clerk, one copy is delivered to the board, the original and one copy of the purchase order is delivered to the vendor.
Upon submitting his claim for payment to the county, the vendor is required to submit one copy of the purchase order with his invoice.
Receiving reports are also prescribed so that an accurate inventory may be maintained. The State Department of Audit is required to design forms to be used under the system. See Miss. Code Ann. § 31-7-101 through 115.
Miss. Code Ann. § 65-7-95 contemplates a definite decision, before any equipment is rented, of why the equipment needs to be rented by the county, to what use it shall be put, and why the public interest is promoted by renting. This advance decision of the board is evidenced by order spread on the minutes.
Likewise, Miss. Code Ann. § 31-7-103 contemplates a requisition and purchase order before any product is purchased. These statutes, applicable only for expenditures for county roads and bridges, are given for a basic understanding of the facts of this case. There are other laws governing expenditures of county funds which will be discussed in the opinion.
While the time of initiation is not shown in the record, there was in effect in Jackson County in 1976 a practice of renting heavy equipment (road graders, bulldozers, draglines, backhoes) by a member of the board simply calling and securing the services from one of the county bidders for such services. At the end of the month the supplier would invoice these supervisors' district for the number of hours each piece of equipment was used, the hourly rate, and the charge therefore.
No prior board orders, as required by Miss. Code Ann. § 65-7-95, were ever entered on the minutes of the board showing the necessity for such rental, the purposes to be used, or the promotion of the public interest by such rental.
Jackson County adopted the central purchase system required by statute and this procedure was in effect in 1976.

HOW CUMBEST, VAUGHAN, AND COLEMAN OPERATED
One of the individuals who rented equipment to the county was Hal G. Vaughan (Vaughan), under the business name of H & O Materials and Equipment Rentals (H & O). He did not merely rent machines, each piece of equipment rented included an operator as part of the charge. Each month Vaughan would contact Cumbest and determine whether his charges were satisfactory, and also how Cumbest wanted him to charge the county.
*213 Following the discussion between the two, Vaughan would prepare an invoice on an H & O letterhead.
Vaughan would then deliver the H & O invoice to the purchase clerk, after which the purchase clerk notified Coleman to come to his office. Coleman would go to the office of the purchase clerk, and sign a prepared requisition based on the invoice.[1] The purchase clerk would then prepare and sign a purchase order, and Coleman would sign a prepare requisition report. The invoice and three documents usually bore the same date.
The H & O invoices would sometimes state certain roads in the county upon which the equipment was used, but just as often they would simply state, "Rental of equipment under supervision of County Road Foreman." Coleman was a county road foreman for District 1. Each invoice would then specify the various pieces of equipment used, including the serial numbers. There would then follow a total of the hours each piece of equipment had been used that month, the hourly rate and the amount charged for the particular piece of equipment for the month. The invoice then totalled the amount due for all rental charges. There was no itemization showing date of use, or specific place of use on any date, or hours of use on any specific date.[2]
A series of over forty invoices and claims beginning in April, 1976, and ending in September, 1979, revealed monthly rental charges of a charge rate minimum of $500.00 to a maximum in excess of $18,000.00. These invoices to District 1 for this period of time exceed $240,000.00, of which virtually the entire amount was for rental of equipment.[3]

COLEMAN AND THE TRACTOR
In 1974 District 1 began operating a public park consisting of approximately 33 acres, named East Central Park. In 1976 clearing was started on a 97-acre tract for a public golf course, also in District 1, which opened in 1978 and was named Jackson County Public Golf Course.
In 1976 Coleman was the owner of a small tractor and bushhog. According to Coleman, he told Cumbest he would like the job of cutting the grass in the park, and about a week later, Cumbest told him to talk to Vaughan about doing the work, since Vaughan had a contract with the county for cutting grass.[4] When he talked with Vaughan, Coleman told Vaughan he would do the work for $7.50 per hour. Following this, each month Coleman would give H & O a handwritten ticket stating a certain number of hours, "bushhog work," the charge, and signed "Dale Coleman." The tickets were also dated.
According to Vaughan, Cumbest contacted him in 1976:
A I rent draglines, bulldozers, loader graders, backhoes, front end loaders, dump trucks, asphalt distributors, rollers, bushhogs, lowboys.
* * * * * *
A Yes, sir. I don't remember the exact date and time of it. But Mr. Cumbest called me in reference to handling a bushhog. Mr. Coleman owned a tractor and a bushhog and was doing work for the County, but he couldn't bill it to the County because he didn't have a bid with them. And Mr. Cumbest said he would like for me to handle it because I did have a bid with the County and could *214 legally run it through my books and handle it for him.
Q What words did Mr. Cumbest use as best you can remember about how you were going to handle it?
A Well, Mr. Coleman would just turn in his bill to me for his work and I would take my bid price on that particular piece of equipment and invoice the County for it, and when I got paid I would turn around and pay Mr. Coleman.
Q What was the agreement, Mr. Vaughan, concerning billing with the County? What was your agreement with Mr. Cumbest?
A Well, really wasn't any agreement; I mean just he had asked me if I would be willing to do that, and I told him I would be glad to do it. And I was, because I was doing quite a bit of other work for the County anyway. I would just call up every month whatever Mr. Coleman turned in and get it approved by Mr. Cumbest.
Q By every month; from 1976 through '79  is that what you are talking about?
A I do every month. If I do any work for a Supervisor, at the end of the month when it is time to turn the bills in I call him up and talk to him and ask him how he wants it invoiced; what he wants it charged to. I tell him how much was charged and what they were and everything, so he is aware of what it is. And then he tells me what to charge it to and how to handle it.
Q For instance, in the case of Dale Coleman's bushhog and tractor, tell us how that worked in the years 1976 through '79? Each month how did that work?
A Well, Mr. Coleman gave me the bill. I would take the hours on his bill and multiply it by my price.
Q Was there a difference there, Mr. Vaughan? A difference between what he charged and you did?
A Yes sir, there was. He started off around Six Dollars ($6.00) an hour; then he went to Seven and a Half ($7.50); and then he went to Nine ($9.00), and then to Ten ($10.00). My price at the time was Nine Dollars ($9.00), and he was bidding $6.00 and $7.50; that's what I was paying him. I was making Two to Two and a Half ($2.00-$2.50) an hour above what he was making. It was worth that much to handle it  run it through my books and handle it. That was my bid price.
Q And did Mr. Cumbest agree with you that you could charge your bid price?
A Yes sir, that was the bid price to the county on all bushhog work.
The testimony of Vaughan, Coleman and Cumbest as to this arrangement was in material agreement. Coleman would give H & O a ticket of his charge, Vaughan would thereafter discuss with Cumbest his monthly bill for rental of equipment, as well as a charge for Coleman, and then include Coleman's bill in the H & O invoice for the monthly rental of all equipment to District 1, but at the bid charge of H & O for bushhog rental, always a higher rate than Coleman was charging H & O. Neither Vaughan nor any other person connected with H & O attempted to supervise or in any manner check upon the work Coleman did in the park. Other than perhaps seeing Coleman's tractor and bushhog on one or two occasions, Vaughan knew nothing about his equipment and he knew absolutely nothing about the work Coleman was doing.
There was no dispute in the testimony that Vaughan would always discuss the H & O bill with Cumbest before filing the invoice with the purchase clerk.
Over forty H & O invoices were offered into evidence for the 42-month period beginning April, 1976, and ending September, 1979. Upon several occasions, a claim by H & O would include more than one invoice, in which one of the invoices was directed to payment by District 1, and the other was directed to payment by District 2 funds.
Of the H & O invoices paid by District 1 funds, the vast majority make no mention of bushhog rental. Vaughan testified the *215 reason these invoices made no mention of bushhog rental was that he was instructed by Cumbest to invoice the county in this manner. Following such instruction Vaughan would thus include Coleman's charges at the hourly bid rate of H & O for bushhog rental under some charge such as dragline work, backhoe work or grader work.
Cumbest denied he ever told Vaughan to disguise or conceal Coleman's hours or charges in any such manner. Thirty-four of the H & O invoices to the county for equipment rental to District 1 contained no notation or clue that any of the rental charges are for bushhog rental. When Coleman was shown each of these invoices by the purchase clerk, and then signed a requisition for such work, as well as a receiving report acknowledging the performance of the work as set out in the invoices, he knew that part of the invoice covering rental for work presumably done on roads and bridges in District 1 had not been performed. Somewhere in the invoice there was a concealed charge to the county for money H & O was going to pay him. Despite this, Coleman signed a requisition and a receiving report which each tracked the language of the services contained in the invoice.[5]
At the trial, Cumbest expressed astonishment that the invoices and charges to District 1 had been made in this manner. He testified that after he and Vaughan agreed on a price for the month, he never checked any of H & O's claims except the bottom line.
The same arrangement used on the park continued on the golf course. The H & O invoices began April 22, 1976, and ended September 24, 1979.
Because of a hurricane, Vaughan had none of the Coleman tickets prior to August 22, 1977. There were sixteen exhibits introduced at trial, evidencing claims made prior to August 22, 1977. In these sixteen exhibits, six of the H & O invoices reflected a charge for bush hog rental.[6]
These six exhibits showed H & O had paid Coleman $3,529.50 and had charged the county $4,609.50, a return of $1,080.00 for whatever service H & O was rendering the county.
In the remaining ten exhibits, none of the H & O invoices mentioned bushhogging. There is no way to examine any of the H & O invoices contained in these exhibits and determine what H & O was in fact charging the county for the amount it was paying Coleman. The only thing we have is Vaughan's testimony that somewhere in the H & O invoices is buried Coleman's charge for that month's bushhog work.
The remaining 26 exhibits include the monthly ticket or tickets Coleman submitted to H & O. Eight of these remaining exhibits include two tickets from Coleman to H & O[7] and in each of these one of the tickets was paid from District 2 funds of Jackson County, General Recreation Fund, and the other was paid by District 1. In all H & O invoices to be paid by District 2 funds, the invoices billed for bushhog rental and showed the same number of hours shown on the Coleman ticket. On these District 2 charges, H & O paid Coleman a total of $4,365.00, and charged Jackson County $6,696.00, or a $2,331.00 service charge for its billing.
With the exception of Exhibit 39, in the remaining 26 exhibits, which included claims paid by District 1 funds, none of the H & O invoices included any reference to bushhog rental. Again there is no way to examine any of these invoices and determine: how much represents the amount H & O was paying Coleman, how much H & O was charging the county for this billing service, and which part is genuine. The best Vaughan could do was testify the bill was correct, except for the amount paid Coleman, plus his billing rate (whatever that was), contained somewhere in the invoice.
*216 The 42 exhibits include the 42 months from April, 1976, through September, 1979. Thirty-two of these exhibits included tickets of the number of hours Coleman was charging H & O that particular month for bushhog work.
In these 32 months, Coleman put in a charge to H & O of a total of 3,637.5 hours  or a monthly average of 113 2/3 hours. These tickets were the only record produced of the work Coleman claimed to have performed on bushhogging. Coleman testified he also kept the number of hours he had put in each month in a little black book, but such a record was never offered in evidence.
Louis C. Green, his son, Louis, Jr., and son-in-law, Eddie Patrick, testified as State's witnesses. Green testified they bushhogged for Coleman from 1976 to 1979 at East Central Park, and cut grass at the golf course at certain times. They were paid $2.50 per hour, and kept a record of time from the time meter on Coleman's tractor. They would take the meter reading on the 19th of the month and give it to Coleman and were paid in cash. In 1979, their hourly rate was increased to $3.00.
According to Green, for not over five days a week, they averaged two-three hours a day, during the months of May, June, July, August, and September. They did no cutting in the winter months. During the period they were cutting grass, Green never saw any person using Coleman's tractor except one of the three of them. They were paid $200-$300 per month from May through September the years they worked.
According to Patrick, during the period they were using the bushhog, the tractor meter did not record any other person using the tractor. According to Patrick, two hours per day was about the maximum they mowed any one day, and they could not cut grass on the days it rained. They never cut grass in winter months, and he never saw the tractor used in winter months.
The Greens and Patrick had fulltime jobs; the bushhogging was done during their off hours. The State also offered proof that in the month of July, 1979, it had rained fourteen days in Jackson County. Coleman presented H & O with two tickets on July 20, 1979, one for 136 hours to be charged to District 1, and the other for 112 hours to be charged to District 2. These are part of Exhibit 37.
According to Coleman and his two sons, Harold and Gerald, the Greens and Patrick were not the only persons who did the bushhog work. They testified that they also cut the grass in the park and on the golf course. They, likewise, testified they cut a lot of grass on the golf course in the winter months and were working twelve months a year. Coleman testified the hours he charged H & O for bushhogging were true and accurate.
The circumstances of Coleman's charges to H & O and from H & O to Jackson County were brought to light when the Federal Bureau of Investigation was investigating Vaughan on a federal charge in the State of Alabama. Vaughan pleaded guilty to the federal charges and cooperated with the State in furnishing records of his transactions.
Following trial, the jury returned a verdict of guilty as to both Cumbest and Coleman, and judgment of conviction was thereupon entered.
Coleman has not prosecuted an appeal.

LAW

SUFFICIENCY OF THE EVIDENCE
While not the first assignment of error, the threshold question is whether or not a jury issue was made on fraud. Did the jury have sufficient evidence to determine deceit was practiced on Jackson County, as a result of which public funds were paid when nothing was received.
Cumbest and Coleman were indicted under Miss. Code Ann. § 97-11-31, which provides:
If any officer, or other person employed in any public office, shall commit any fraud or embezzlement therein, he *217 shall be imprisoned in the penitentiary not more than ten years, or in the county jail not more than one year, or be fined.
They were charged with knowingly and feloniously, from April 1, 1976, through October 31, 1979, defrauding Jackson County of $50,753.40.[8]
The duty was upon the state to prove, not merely that the payments Cumbest and Coleman approved were unauthorized by law or erroneous, but that Coleman and Cumbest approved payments which they knew were not in fact due any person. Stated another way, did they intend to, and in fact cause Jackson County to pay money when they knew it was not due any person whatever? Did they intend to, and actually cause financial injury to Jackson County?
We considered the statute under which Cumbest and Coleman were indicted in Smith v. State, 107 Miss. 486, 65 So. 564 (1914). In that case we affirmed the conviction of a penitentiary trustee who had participated in and approved an automobile dealer's sale to the state of a second-hand automobile (which the trustee had previously owned and traded in to the dealer on another car), at a grossly inflated sales price. We said:
It is difficult to define fraud. In its commission there are devices "almost infinite in variety." As it involves breach of duty, trust, or confidence, it includes all acts, omissions, or concealments by which another is injured, or an undue or unconscientious advantage is taken. P. 496, 65 So. p. 567.
Also, in Pegram v. State, 121 Miss. 564, 83 So. 741 (1920), even under another less severe criminal statute involving a member of a board of supervisors who had approved a partial payment to a road contractor under a road contract (presently Miss. Code Ann. 19-13-35), we stated a conviction would require "fraudulently or corruptly voting for an unauthorized claim." In reversing Pegram's conviction, we noted that the evidence, taken most strongly for the state, at most showed the supervisor made a mistake in judgment, and not dishonestly.
We begin with an examination of the method of doing business with H & O.
Under Miss. Code Ann. § 65-7-95, the rental of equipment is restricted to heavy equipment, and on specific, or special occasion. Further this statute is addressed solely to county work on roads and bridges. A prior order of the board setting forth the need, purposes, type of equipment, and reasons why it will promote the public interest is required before such rental is authorized. These provisions were ignored. Instead, H & O rented equipment on verbal instructions from Cumbest, on a day-to-day, as-needed basis over a period of years. The method of billing the county is also strange. Rather than simply submitting the H & O invoice for services rendered, Cumbest and Vaughan would first meet and go over the charges for that month. This procedure might have been all right for a private business, but public money was being spent in which the public was entitled to see on written documents the reason for each dollar spent. The invoices are incredibly vague. While some mention certain roads on which the equipment was used, many do not, simply stated "Under supervision of County Road Foreman," not giving his name. There is no date or specific location on the invoice to show that on a definite date, at a definite place, a definite machine operated a definite number of hours. The invoice was no more than a recapitulation sheet giving a summary for that particular month.[9] If there were any more records of the work performed, they are not in this record. Any investigator or auditor seeking to determine the specific *218 use of equipment would have to depend on the memory of Cumbest, Vaughan, some employee of H & O, or some road hand.
Over $200,000.00 of District 1 funds were spent in this incredibly lax manner.
Likewise, the provisions of Miss. Code Ann. § 31-7-103 were ignored. This statute required that before any purchases shall be made or services rendered by a county supplier:
(1) A supervisor or authorized county employee must prepare and file a requisition to purchase with the county purchase clerk, and
(2) The purchase clerk must issued a purchase order.
In this case, the procedure was reversed. The county was first invoiced for services claimed to have been rendered, after which a requisition and purchase order were made to match the invoice. Also prepared at the same time was a receiving report, likewise matching the language of the invoice.
There was no semblance of compliance with Miss. Code Ann. § 19-13-15 which requires an inspection committee appointed by the board for public work less than $1,000.00, or a superintendent when in excess of $1,000.00 and written certifications filed with the board of work performed before any payment is authorized.
While the desire of a county official to furnish his constitutents a public park or golf course is estimable, the Legislature has set forth the procedure whereby a county may establish a county park or public golf course. This is under the provisions of Chapter 494, Laws of 1974, Miss. Code Ann. § 55-9-53 et seq. Under this law, the county board establishes a county park commission, which operates the recreation areas in the county. This record does not show any attempt to establish or operate either the park or golf course under a Jackson County park commission.
There was no statutory authority for District 1 to informally establish and operate a park and golf course, and pay a private person or firm public money. Further, there was no statutory authority to rent equipment for use on such park or recreation area.
Even with the best of motives, there is simply no excuse for the disregard of the statutory provisions we have outlined.
Into this ocean of uncertainty there was introduced in 1976 another obscurity: the arrangement with Coleman to do the necessary bush hog work on the park and golf course.
How did Coleman render these services? For the most part he hired as cash labor three acquaintances of his, used county diesel fuel, and as far as this record shows, maintained no records whatever. Toward the latter part of each month for 42 months, he simply delivered a handwritten ticket to H & O showing a total of the hours he claimed to have put in that month. No specific dates, no specific hours on any date, and no original records.
H & O, in turn, invoiced the county  not at Coleman's rate, but at an inflated hourly charge in the amount H & O would have billed the county had its equipment and its own personnel operated the bush hog.
Counsel contends this was a subcontract between Vaughan and Coleman. This was in no sense a subcontract. When a contractor subcontracts work, he remains primarily responsible for its performance. In this case, Vaughan neither assumed nor knew whether Coleman was doing any of the work. He knew nothing about it. Even if the work was performed, charging Jackson County at an inflated rate was a fraud running into several thousands of dollars.
This arrangement with Coleman remained a secret, and was not revealed by Coleman or Cumbest, at least of public record. It came to light when Vaughan was investigated by the Federal Bureau of Investigation on a federal crime.
The H & O invoices to the county were for work supposedly done on county roads and bridges, not a park or golf course.
*219 Moreover, Vaughan testified, and the jury was entitled to believe him, that Cumbest instructed him to prepare invoices that dealt with Coleman's bush hog work in such a manner that this charge would be concealed under the disguise of grader work, dragline work, or bulldozer work. Vaughan testified it made no difference to him how it was billed, and this is evidenced by the fact that whenever another supervisor's district's fund was paying for the work, it was at least labeled as bush hog rental on the H & O invoice.
Coleman examined and approved these disguised invoices.[10] He approved incorrect and false invoices, and then tracked their language in requisitions and receiving reports.
Counsel for Cumbest also maintains the burden was upon the State to prove Coleman did not perform the bush hog work. They err as to the law. Once the State proved the county did not receive the services for which the county was charged, and for which Coleman and Cumbest approved payment, and public monies were thereby spent, the State made a case of fraudulent misappropriation of public money.[11]See Lipscomb v. State, 148 Miss. 410, 114 So. 754 (1927) pp. 420-421, 114 So. p. 756.
The duty then devolved upon Cumbest and Coleman to show that the county had in truth received lawful services for which a charge in the amount of the invoice could be lawfully made.
Manifestly, they failed to so demonstrate. It was a jury issue to determine whether or not Coleman had done the work he claimed to have done.
Moreover, the state adduced ample evidence from which the jury could have determined one-half the number of hours Coleman charged on his tickets would have been a liberal estimate of the number of hours his bush hog was actually used on the park and golf course. Indeed, the jury would have been cretins not to have believed Coleman submitted and was paid for tickets which were bloated all out of proportion and for months in which no work was performed.
On or about the 20th day of each month, Coleman would submit a ticket to Vaughan for bush hog work. Vaughan would thereafter discuss H & O's monthly bill, which included Coleman's charge, with Cumbest. Following the verbal agreement between Cumbest and Vaughan, Vaughan would invoice the county for H & O. Coleman approved all invoices by tracking the invoices' billing on a requisition and receiving report, with the exception of one which Cumbest signed. These documents were presented together as claims against the county, approved by Cumbest at the subsequent monthly meeting of the board of supervisors and thereafter duly paid.
Each month for 42 months, Vaughan knew the score, Coleman knew the score, and Cumbest knew the score.[12]
In sum, therefore, it was a question for the jury to determine whether or not, over a period of years, pursuant to an agreement between Cumbest and Coleman, public money of Jackson County was paid H & O which was not due and owing H & O or anybody else.
The criteria of Smith and Pegram are fully met in this case, and it would be an assault upon intelligence to claim no jury issue was made on whether or not these defendants intended to, and did in fact deceive and defraud Jackson County.
The precise amount Jackson County paid H & O for which nothing whatever was due could never be determined, but the jury would have been amply justified in finding at a bare minimum at least $20,000.00 of *220 public money was spent which was not due anybody.

WAS THE INDICTMENT SUBJECT TO DEMURRER?
In addressing appellant's claim the demurrer to the indictment should have been sustained, we begin with noting that we have twice held indictments under this statute were not subject to demurrer. Smith v. State, 107 Miss. 486, 65 So. 564 (1914), and Blakeney v. State, 228 Miss. 162, 87 So.2d 472 (1956). A copy of the indictment is set forth as an appendix to this opinion.

A. IS THE STATUTE UNCONSTITUTIONALLY VAGUE?
The first complaint is that the statute under which the indictment was returned is unconstitutionally vague. Is "fraud committed in public office" by a public official or public office so vague as to fail constitutional muster?
Fraud, though it may embrace myriad forms of human behavior as unlimited as the human imagination, is not difficult to categorize in understandable terms. It may be discerned with reasonable certainty from dishonest conduct by one person whereby another is injured. Ordinary citizens know common honesty and know when a person has been caused to pay money not due as a result of the dishonesty of another.
We concur with the general statements of law cited by appellant that a statute must be worded so that a person of ordinary intelligence has a reasonable opportunity to know what is prohibited. State v. Winslow, 208 Miss. 753, 45 So.2d 574 (1950); Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).
The statute in this case meets the test. Fraud committed in public office, as we have interpreted this statute, connotes dishonesty in public office whereby the county or state pays money which is not due. Smith v. State, 107 Miss. 486, 65 So. 564 (1914). See also, People v. Willson, 205 Mich. 28, 171 N.W. 474 (1919); and U.S. v. Bougie, (S.D.Cal. 1954) 118 F. Supp. 359.

B. WAS THE INDICTMENT VAGUE AND INDEFINITE?
The indictment (omitting formalities) charged Cumbest and Coleman, as a county official and county employee, respectively, between April 1, 1976, and October 31, 1979, with knowingly and feloniously defrauding Jackson County of approximately $50,753.40 in that they submitted, or caused to be submitted, false and fraudulent claims monthly from H & O for equipment rental of a bush hog with intent to cheat and defraud Jackson County of this sum of money, in violation of Section 97-11-31. The indictment further recited that attached thereto as Exhibit 1 was one of a series of false and fraudulent claims submitted by H & O.
The indictment gave the statute under which the defendants were charged, and followed its language, which generally is sufficient. Anthony v. State, 349 So.2d 1066 (Miss. 1977); State v. Labella, 232 So.2d 354 (Miss. 1970); Love v. State, 211 Miss. 606, 52 So.2d 470 (1951). We believe in this case, however, more was required in an indictment under the statute than the language of the statute itself.
In Jackson v. State, 420 So.2d 1045 (Miss. 1982), p. 1947, we held that where the prohibited act would not clearly appear simply by using the language of the statute, then the indictment would have to be more specific. An indictment which simply charged the defendants with fraud in public office would not have met this requirement.
The state fully met this requirement. The indictment is plain and the defendants were fully informed of the nature of the offense.

WERE THE DEFENDANTS ENTITLED TO A BILL OF PARTICULARS?
No authority is cited under this assignment. We have held that an accused *221 is not entitled to a bill of particulars on an indictment. Andrews v. State, 237 Miss. 875, 116 So.2d 749 (1960); Bright v. State, 293 So.2d 818 (Miss. 1974); Overstreet v. State, 369 So.2d 275 (Miss. 1979).
Moreover, under our criminal discovery rules, the defendants were fully apprized well in advance of trial of all evidence, oral and documentary, offered by the state. The argument that an accused is entitled to a bill of particulars under a criminal indictment has become dissipated with the advent of criminal discovery rules. The proper use of discovery, as was done in this case, avoids the possibility of any prejudice to an accused through inability to obtain a bill of particulars to an indictment.

SHOULD THE DEFENDANTS HAVE BEEN INDICTED AND PROSECUTED UNDER A MISDEMEANOR STATUTE?
Another argument asserted in support of the demurrer is that the state, if it was going to charge Cumbest with any offense, should have proceeded under Miss. Code Ann. 19-13-35, a misdemeanor. Motions were also made to reduce the charge to a misdemeanor and the circuit judge's overruling these motions is also assigned as error. Finally, counsel argue that the circuit judge erred in the imposition of sentence, that the court was legally bound to sentence the defendant under Miss. Code Ann. 19-13-35, and could not impose sentence under Miss. Code Ann. 97-11-31, the felony statute under which Cumbest and Coleman were indicted.
Because of their close similarity, we will consider these assignments together, even though a different argument is made in support of each.
On the demurrer, Cumbest argues Miss. Code Ann. 97-11-31 is a general statute, while Miss. Code Ann. 19-13-35  covering the same acts with which he was charged  is specific, and therefore, he should have been charged under the specific statute.
Cumbest supports his argument that the circuit judge should have sustained his motions to be changed to a misdemeanor by reiterating the indictment at most supports a misdemeanor charge. Further, he states that the indictment failed to charge personal gain to himself, and consequent damage to Jackson County, and therefore constituted no offense under Miss. Code Ann. 97-11-31.[13]
Cumbest cites the rule in Grillis v. State, 196 Miss. 576, 17 So.2d 525 (1944), to support his contention he should at most have been sentenced under Miss. Code Ann. 19-13-35.
We first examine the two statutes.
Miss. Code Ann. 97-11-31 states:
If any officer or other person employed in any public office, shall commit any fraud or embezzlement therein, he shall be imprisoned in the penitentiary not more than 10 years, or in the county jail not more than one year, or be fined.
Miss. Code Ann. 19-13-35 states:
PENALTY FOR UNAUTHORIZED APPROPRIATIONS.
If any person shall claim and recieve from the Board of Supervisors of a county any fee or compensation not authorized by law, or if a member of such Board shall knowingly vote for the payment of any such unauthorized claim, or any appropriation not authorized by law, he shall be subject to indictment, and, on conviction, be fined not exceeding double the amount of such unlawful charge, or may be imprisoned in the county jail not more than three months, or be subject to both such fine and imprisonment.
It is apparent that, insofar as Cumbest was concerned, there is some overlapping in the two statutes, but also true the two statutes are not the same. Coleman and Cumbest were both indicted under Miss. Code Ann. 97-11-31. It is doubtful the state could have proceeded against Coleman under Miss. Code Ann. 19-13-35. While part of a fraudulent scheme to defraud the county, Coleman made no claim *222 to the Board of Supervisors. Further, under Miss. Code Ann. 19-13-35, it is "knowingly" voting for the payment of a claim or appropriation not authorized by law which constitutes the offense, insofar as a Board member is concerned. Under Miss. Code Ann. 97-11-31 "any fraud" committed by a public official or public employee is embraced. The fraud with which Cumbest and Coleman were charged covered a much broader area of conduct and higher magnitude of culpability than simply "knowingly" voting for an unauthorized claim.[14] An analysis of appellant's contention can best begin by clearing the air of one possible misapprehension. Even where there are two statutes covering the same crime, and there is a difference in the penalty between the two statutes, the state is under no obligation to prosecute under the statute with the lesser penalty. It may choose to prosecute under either, and so long as the choice is clear and unequivocal the defendant has no right to complain. This is a general rule in our state as elsewhere. Brooks v. State, 236 So.2d 751 (Miss. 1970); Lee v. State, 201 Miss. 423, 29 So.2d 211 (1947); Sparf v. United States, 156 U.S. 51, 63-64, 15 S.Ct. 273, 39 L.Ed. 343, 347-348, (1895); Berra v. United States, 351 U.S. 131, 76 S.Ct. 685, 100 L.Ed. 1013, (1956); United States v. Ruggiero, 472 F.2d 599 (2d Cir.1973), certiorari denied, 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398; Mauney v. United States, 454 F.2d 273 (6th Cir.1972); United States v. Coppola, 425 F.2d 660 (2d Cir.1969); Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); State v. Bowers, 273 N.C. 652, 161 S.E.2d 11; Boggs v. Raines, 273 F.2d 636 (10th Cir.1959), In re Watkins, 51 Cal. Rptr. 917, 415 P.2d 805, 64 Cal.2d 866; State v. Dumont, 3 Or. App. 189, 471 P.2d 847 (1970).
What, then, gives rise to situations as so claimed by appellant?
As to his first claim that he was entitled to be prosecuted under a "specific" statute as opposed to a "general" statute, we have addressed this question twice, both involving forgery of credit card owners' names on credit card slips. In McCrory v. State, 210 So.2d 877 (Miss. 1968), the defendant was indicted for forgery of a credit owner's name on a credit card slip under the general forgery statute, as opposed to criminal statute dealing specifically with credit cards.
The defendant argued he was entitled to be prosecuted under the criminal statute pertaining to forgery of a credit card owner's name, rather than the general forgery statute. In rejecting this argument, we stated:
It is a fundamental rule of statutory construction that when two statutes encompass the same subject matter, one being general and the other specific, the latter will control. 1 Sutherland Statutory Construction § 2022 (3rd ed. 1943). However, that rule is not applicable here since the above-mentioned statutes do not cover the same subject matters. Section 2148.5 makes it a misdemeanor to fraudulently use a credit card to obtain or attempt to obtain goods, property or services, regardless of whether a forgery is committed. While the appellant could have been charged under § 2148.5, there is nothing in that statute to preclude his being prosecuted under the general forgery statute. [Pp. 877-878]
On quite similar facts, the same argument was also rejected in Bence v. State, 240 So.2d 630 (Miss. 1970).
Just as there are other kinds of forgery than forgery of a credit card, the fraud embraced in Miss. Code Ann. 97-11-31 is much broader than the fraud or bad *223 faith that might be embraced by simply "knowingly" voting to pay a claim not authorized by law.[15]
Even if the criminal statutes cover the same criminal act in virtually the same language, however, and one provides for a greater penalty than the other, the state, as we held in Brooks v. State, 236 So.2d 751 (Miss. 1970), and Lee v. State, 201 Miss. 423, 29 So.2d 211 (1947), may proceed under either. Nothing stated in McCrory or Bence should be construed as limiting this state's authority to proceed under either section so long as the indictment is clear and unequivocal.
Grillis v. State, 196 Miss. 576, 17 So.2d 525 (1944), deals with the situation in which the indictment, or proof, or both cast substantial doubt on which criminal statute the state has proceeded under, or could proceed under, the statute with the lesser penalty will be applied. It is this rule that Cumbest argues as obligating the circuit judge to sentence him under Miss. Code Ann. 19-13-35, the misdemeanor statute. This rule as applied initially and in subsequent cases, is not examined.
In Grillis, a restaurant owner had a diseased hog on his farm. He slaughtered and cleaned the hog and took the meat to his restaurant, where it was discovered by a health inspector. Mississippi had in effect two criminal statutes of possible application for this case. Miss. Code Ann. 1100 Code of 1930 (presently Miss. Code Ann. 97-27-15) makes it a crime for a "butcher or other person" to sell the flesh of any animal dying otherwise than by slaughter, or slaughtered when diseased. Miss. Code Ann. 1102 Code of 1930 (presently Miss. Code Ann. 97-27-19) makes it a crime for any person to sell as human food the flesh of any animal which died a natural death, or which has been killed by accident, or the flesh of any diseased animal. The first statute is a felony, the second a misdemeanor.
Grillis was charged under the general criminal attempt statute of overt acts and the design and the attempt to violate both sections. Without specifically referring to either section, the indictment charged him with slaughtering the hog for sale as human food. To constitute a crime under § 1100 of the 1930 code, it is not necessary that the diseased meat be sold for human food, and to constitute a crime under § 1102 of the 1930 code, it is not necessary to charge the defendant with slaughtering the diseased animal. Yet, the defendant was charged with both slaughtering and offer for sale as human food. The indictment did not name either code section, but evidently was drawn in such a manner as arguably to come under either section. Grillis was not charged with being a butcher, however, or any occupation which under strict construction of criminal statute could be classified as butcher.
We then stated (17 So.2d Page 527 of the opinion):
The case, then, is one for the application of the rule that when the facts which constitute a criminal offense may fall under either of two statutes, of when there is substantial doubt as to which of the two is to be applied, the case will be referred to the statute which imposes the lesser punishment.
It can thus be observed in Grillis, because the defendant was neither a butcher or similar classification, there was some doubt as to whether the felony statute applied to him.
In the cases since Grillis, in which we have applied the rule, either the indictment, or the proof, cast substantial doubt on whether the accused was being or could be prosecuted under the more serious statutory offense. See: Burns v. State, 438 So.2d 1347 (Miss. 1983); Carleton v. State, 438 So.2d 278 (Miss. 1983); Bourdeaux v. State, 412 So.2d 241 (Miss. 1982); White v. State, 374 So.2d 225 (Miss. 1979).
This problem is not presented in this case. Here the state in the indictment specifically charged the defendant with violating
*224 Miss. Code Ann. 97-11-31, and the proof supported the indictment.
In Prisock v. State, 244 Miss. 417, 141 So.2d 715 (1962), the same contention was made as here. Prisock and several others were charged under the criminal attempt statute of overt acts in the conspiracy and design to commit the crime of obtaining money under false pretenses. Because the indictment used the word "conspiracy", Prisock argued he should have been proceeded against under the attempt to violate the conspiracy statute. We held the indictment clearly charged, and the proof supported the crime of attempt to commit the crime of obtaining money under false pretenses, and the state was authorized to prosecute accordingly.
The state had the authority to prosecute the defendants under Miss. Code Ann. 97-11-31, it clearly and unequivocally prosecuted under this section, and no error was committed in prosecuting and sentencing the defendants under this section.

SHOULD THE INDICTMENT HAVE BEEN QUASHED BECAUSE OF PRE-TRIAL PUBLICITY?
Appellant argues his motion to quash the indictment should have been sustained because:
(a) Prejudicial pre-indictment publicity;
(b) Misconduct of the District Attorney in making statements concerning the investigation at the time the grand jury was in session;
(c) Permitting the grand jury to hear hearsay evidence.
Appellant cites one case in support of this assignment: State v. Owen, 156 Miss. 487, 126 So. 25 (1930). Two justices of the peace and a constable had been investigated independently by the Forrest County Bar Association for extortions allegedly committed by them as public officials. The Bar made a written report highly critical of these officials' conduct, and two of the leading members of the Forrest County Bar appeared before the grand jury and while there gave copies of the report to the grand jurors. The circuit judge quashed the indictment subsequently returned against these officials, and we affirmed.
The integrity of a grand jury must be jealously guarded. It is, however, invasion of the inner sanctum which courts scrupulously guard against. Thus, in State v. Owen, it was not the wide-spread publicity which we condemned, but prominent attorneys, who were not witnesses, going before the grand jury with a report of an independent investigation by the local Bar. Again, in Sanders v. State, 198 Miss. 587, 22 So.2d 500 (1945), we condemned a circuit judge, during the absence of the district attorney performing the latter's duties before the grand jury. For cases involving improper persons in the grand jury room, see also Welch v. State, 68 Miss. 341, 8 So. 673 (1890); State v. Barnett, 98 Miss. 812, 54 So. 313 (1911); Stampley v. State, 284 So.2d 305 (Miss. 1973).
In Price v. State, 152 Miss. 625, 120 So. 751 (1929), friends and relatives of the deceased victim petitioned the grand jury to indict the defendant, but none appeared in person before the grand jury. We there recognized grand juries are governed by different rules than trial juries. Grand jurors are not sequestered as trial jurors, are free to disburse for lunch and go home in the evenings. They are not questioned prior to being chosen as to whether they have leaning or bias in any of the particular cases about to be investigated.
In Price, supra at 756:
It is to be recognized that a person is not to be presented by coercion by a grand jury or by undue influence and misconduct, but before an indictment is quashed, it should clearly appear that the grand jury did not perform its duties fairly and impartially, and with due regard for the public welfare, but that they were subjected to such influence and improper conduct as makes it clearly appear that the indictment was coerced or improperly procured.
Recently, in Mosley v. State, 396 So.2d 1015 (1981), we addressed this question. The defendant made a motion to quash the *225 indictment because the grand jury room was adjacent to the district attorney's office and the grand jurors passed through the district attorney's reception office in going to their room, and the grand jurors had coffee and snacks in the reception office in the presence of the secretary and aides. The motion charged the district attorney's office exercised undue influence upon the grand jurors. The circuit judge refused to quash the indictment; we affirmed.
While critizing this arrangement, suggesting the grand jury room be moved to other quarters, and admonishing circuit judges in their deliberations, we did not deem the evidence showed there had been undue influence upon the grand jury.
In this case there was a wide-spread and, no doubt, intense public interest in the district attorney's investigation of the Board of Supervisors of Jackson County. The newspapers and television made repeated reference to the on-going investigation. In all this publicity, however, there was no attempt to try this particular case either by the law enforcement agencies or the news media. We do not have an accused's confession being shown on television or a district attorney appearing on the courthouse steps and telling the world what a villain he is about to prosecute.[16] We do have a case of widespread and prolonged dissemination of newsprint and broadcast of the investigation into county affairs and in which we have no reason to doubt an overwhelming majority of citizens of Jackson County were quite interested.
As to the allegation of misconduct by the district attorney in the grand jury room, there is nothing in this record to show this official did anything improper. A patient trial judge permitted a prolonged, wide-ranging examination of the district attorney, which was of no benefit whatever to the defendants. The profert of evidence the appellant complains of the court excluding was offered by another attorney representing another client. There is nothing to show it had anything to do with this case.[17]
We have examined numerous cases in which pre-trial publicity was alleged to have prejudiced a defendant. In all these cases, however, the defendant claimed he had been denied a fair trial, and that the trial jury had been prejudiced. In this case no claim is made that the enormous pre-trial publicity affected the outcome of appellant's trial, only the grand jury. It would certainly appear that the same pre-trial publicity which affected a grand jury would also infect proposed trial jurors. Yet no motion for a change of venue was made. Indeed, no record was made of the voir dire of the petit jury panel.
No claim being made that the trial jury was prejudiced by pre-trial publicity, it seems illogical to us that a claim would be made that the grand jury was prejudiced.
The numerous cases which have addressed pre-trial publicity have examined its effect on trial jurors, not a grand jury, and in all cases in which appellate courts have reversed a conviction because of pre-trial publicity, none has been called to our attention in which the appellate court also nullified the indictment.
We are not called upon in this case to decide whether the degree of pre-trial publicity which denies a defendant of due process in his trial would also subject the indictment to challenge. We do not propose to reach the question of whether a grand jury is governed by the same standards as a petit jury regarding pre-trial publicity. Under no standard, however, was the appellant denied due process by the pre-trial publicity in this case. See: Tubbs v. State, 402 So.2d 830 (Miss. 1981), *226 p. 837; Snowden v. State, 356 So.2d 1143 (1978), p. 1144; Stevenson v. State, 325 So.2d 113 (Miss. 1975), p. 118; Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344, (1977) pp. 361-362; Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751, (1961); Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663, (1963), and see also annotation of cases on same subject beginning at page 1243.
Finally, any claim that the indictment was based upon insufficient or incompetent evidence is clearly without merit. We have decided this question upon innumerable occassions. See: State v. Matthews, 218 So.2d 743 (Miss. 1969) and cases therein cited.

VIOLATION OF DISCOVERY
L.C. Green made a telephone call to Coleman from the district attorney's office which was taped. This taped conversation contained incriminating statements made by Coleman. In rebuttal, the state attempted to offer this conversation into evidence, and upon objection the court excluded.
Cumbest now assigns as error the failure of the state to apprise defense counsel of the tape and its contents in pretrial discovery.
Since the circuit judge excluded the tape from the jury, and the incriminating evidence only involved Coleman, there can be no merit to this assignment.

ADMISSION OF EVIDENCE
A witness, Lynn Presley, the current Chancery Clerk, testified as custodian of the records of the Board of Supervisors. In his testimony he stated the minutes did not reflect the Board had complied with Miss. Code Ann. § 65-7-95 in adopting an order prior to rental of equipment. According to him, no such order appeared on the minutes. Error is assigned that the Clerk was expressing a legal opinion, which was beyond his expertise, and he should not have been permitted to testify as to what the minutes did not show.
The Chancery Clerk was manifestly qualified to testify whether the minutes reflected the Board had followed a statutory procedure, with which he must monthly comply. He was also qualified to state that from his search of the minutes he could not find a record of a certain procedure. Miss. Code Ann. § 13-1-83.

ADMISSION OF EVIDENCE WHICH COULD BE A CRIMINAL OFFENSE
Proof of other crimes committed by the defendant are not admissible in the trial in chief. An exception as familiar as this rule is proof of other crimes is admissible where relevant on an issue of intent or guilty knowledge. This case falls squarely in the exception. In his testimony on direct examination, Cumbest expressed astonishment Vaughan had concealed or disguised the bush hog rental by Coleman under rental of other equipment. It then became relevant and proper for the state to inquire on cross-examination about a similar procedure in the payment of W.L. Jones, another county employee. Gray v. State, 351 So.2d 1342 (Miss. 1977).

* * * * * *
The progress Jackson County has made in industry and commerce not only has been of invaluable benefit, but is also a source of pride for all Mississippi. As a leader on the Board of Supervisors, the defendant in this case has no doubt played a significant role in that county's development. The ultimate judgment of Lum Cumbest will not be limited, as we are here, to the facts of one particular case.
There being no reversible errors in the trial of this case, it is affirmed.
AFFIRMED.
PATTERSON, C.J., ROY NOBLE LEE, P.J., and PRATHER and ROBERTSON, JJ., concur.
ROY NOBLE LEE, P.J., specially concurs.
WALKER, P.J., DAN M. LEE, BOWLING and SULLIVAN, JJ., dissent.

*227 APPENDIX
The three perpetrators were Cumbest, Coleman and Vaughan; each was necessary to perpetrate the deception on Jackson County.
The question before us is whether a jury issue was made on whether Cumbest knew a fraud was being practiced and perpetrated on Jackson County, and participated in it.
One dissent to this court's affirming the trial court's conviction herein says there is no evidence that Cumbest knew of the fraud or profited from it in any way. Another also states Cumbest did not benefit.
It is no defense to a prosecution for stealing, embezzlement, or any other fraud that one of the perpetrators was in the act for someone else's benefit.
Neither of these dissents contend Coleman was not engaged in a deliberate fraud upon Jackson County. One positively recognizes Coleman was engaged in fraud. I do not believe the other suggests or intimates that a jury question was not made on the issue.
The question, therefore, is: was a jury issue made on whether Cumbest knew a fraud was being practiced on Jackson County during the 42-month period.
The question arises: why did not Cumbest simply employ Coleman to do the bushhog for the county?
The rental of the equipment from Vaughan, doing business as H & O, was restricted to roads and bridges by statute.
Cumbest could have employed Coleman in one of two ways: simply have paid him for extra work and the use of his bushhog, or let Coleman put in a claim to the county each month for bushhog work he had done on the park and golf course. Cumbest's reason for not taking this course was not that he saw anything wrong with it, but it would cause other employees to be unhappy, and to keep harmony among his employees he directed and approved the other arrangement.
The flaw in this contention is that there is no rational reason any other employee could have a complaint about Coleman or his family, in off duty hours, doing this work for the county. Honest work, honest pay, no reason not to be satisfactory.
Of course, if Cumbest had tried to pay Coleman some exorbitant monthly salary for these off-hour duties, this would have been of record, and promptly noticed by fellow employees or other county officials, and questions no doubt asked.
Also, if Coleman had been making a claim himself for labor performed, it would have been a matter of public record and for public scrutiny. Some auditor, investigator, county official, interested citizen, or newspaper reporter would have examined Coleman's claims, and clearly these little tickets would never have passed inspection. Coleman could not have gotten by one single month on one of these little tickets as a claim.
What did work, however?
What was the advantage of the method employed to pay Coleman? They could hide what Coleman was really getting, and the further fact that Vaughan was getting his cream off the top. Indeed, while it is clear Coleman only performed a modest fraction of the work for which he was paid, at least we know what Coleman was paid. To this good day, the public does not know, and never will know how many thousands of dollars Vaughan skimmed off the top, over and above what Coleman got as his "service charge" for this scheme.
According to Vaughan, he was to pay Coleman whatever Coleman and Cumbest said he should pay Coleman, based on a flimsy undocumented ticket, and then Vaughan got what he was paying Coleman plus a service charge for his trouble under a rigged bill to the county. With but a few exceptions, none of the invoices mentioned bushhogging, and all of them claim work done in reference to roads and bridges. None of them intimated they were for work on a park or golf course.
Cumbest, as a member of the Board of Supervisors of Jackson County, was required by law to examine every one of *228 these invoices submitted by Vaughan before approving it for payment. As a member of the Board, he did approve each and every one of them for payment. When he looked  if he looked  at 42 straight monthly invoices, he knew they were false, that the county had not received the number of hours use of the machinery and equipment as shown on the invoice.
Hidden, concealed in that invoice, never to be revealed of public record, was a kickback to Coleman and a kickback to Vaughan.
There was absolutely no difference in approving this invoice than in a county supervisor approving an invoice for 1,000 gallons of gasoline when he knew the vendor only put in 500.
My colleagues discern nothing amiss from this except "poor bookkeeping."
I gave the illustration of the gasoline kickback. My colleagues say Cumbest did not violate the law because it is not shown that he knew coleman was overcharging the county. This is about like accepting a county supervisor's explanation for approving a bogus claim for 1,000 gallons when he knew the county never got anything like that much gas by claiming he knew the gas distributor would make it up some other way.
I suppose my colleagues would reason in the gasoline illustration, "Well, the supervisor knew the county was not getting 1,000 gallons of gasoline, but the state did not prove the supervisor got some of the money."
Let us see what evidence the jury had to discern guilty knowledge on the part of Cumbest.
Over a 42-month period, monthly invoices were submitted to the county by Vaughan, doing business as H & O Materials and Equipment Rentals, Inc. There is not dispute in any testimony that prior to submitting any invoice to the county, Vaughan and Cumbest would discuss the bill to be submitted, and the amount to be paid.
On or before the 20th of each month, Coleman would give Vaughan a ticket for the number of hours he claimed to have bushhogged the previous month. Coleman owned a Ford tractor which he used in the bushhogging. H & O likewise owned tractors which were used in bushhogging, but they were John Deere brand.
After getting Coleman's bill, Vaughan and Cumbest would discuss the bill H & O would submit to the county, which would include the charge for Coleman's bushhogging. According to Vaughan, in most of these monthly invoices which were submitted to District One of Jackson County, Cumbest had told him to put Coleman's charges for bushhogging under some other name or names. That is, Vaughan was not to show on the H & O invoice any charge for bushhogging.
Thus on April 29, 1976, Vaughan submitted an invoice to District One, Jackson County, dated April 22, as follows:
Rental of Cat. C120 Grader Serial # 10R3048, under supervision of County Road Foreman, Month of April, 1976.

 28 hours rental of Cat. C120 grader @
 $20.00 .................................. $560.00

At the next Board meeting, following divine invocation by the local Baptist preacher, Cumbest approved this claim along with other claims.
Jackson County did not receive 28 hours use of any Caterpillar grader from Vaughan that month, but Vaughan got a check for $560.00 from Jackson County, and Vaughan wrote Coleman a kickback check for $510.00 on May 2, 1976.
What service did Jackson County receive for this $560.00? We do not know; we will never know. But we know it did not receive the use of 28 hours of a road grader. How much did Vaughan keep for his service charge that month? We do not know this, either.
After his monthly conversation with Cumbest on May 24, 1976, Vaughan submitted an H & O invoice to District One dated May 21, as follows:
Rental of Bushhog under supervision of County Road Foreman. EQUIPT USED: *229 JD301 Tractor # 173304T w/bushhog. Cat. # 12 Grader # 8T-15932, Bucyrus-Eric Dragline # 121128 Mod 15B. 4/21 thru 5/20/76

 97 1/2 Hr's rental of Bushhog @ $9.00 $ 877.50
 22 Hr's rental of Cat. # 12 Grader @
 $20.00 ............................... 440.00
 24 Hr's rental of 15-B Dragline @
 $20.00 ............................... 480.00
 _________
 $1,797.50

Nothing on the invoice, requisition, or receiving report states or gives any clue that work was done on District One's park or golf course. Since Miss. Code Ann. § 65-7-95 (1972) unequivocally restricts the rental of equipment solely to county roads and bridges, an auditor might be expected to presume the work was performed on roads and bridges as required by law, whether the invoice specifically gave the location or not. Some invoices did give the job location.
No invoice, no requisition, no purchase order, no receiving report for District One ever stated, or hinted the equipment was used on a golf course or park.
At the next Board meeting following submission of the above invoice, Cumbest approved this claim along with other claims to his District.
It is not clear whether the bushhog hours mentioned in the invoice corresponded to the hours Coleman had claimed on his ticket. The bushhog was a different brand than Coleman's. In any event, Coleman got a check on June 8, 1976, from Vaughan for $732.00. If the bushhogging on the invoice was for the same hours as Coleman's then Vaughan got a $145.00 "billing service" fee from the county.
On June 25, 1976, Vaughan submitted an invoice to District One, dated June 22, as follows:
Equipment rental under supervision of Garbage Dump Foreman. Month of June, 1976. EQUIPT. USED: JD450 Dozer, Serial # 210382T

 132 1/2 Hr's rental of JD450C Dozer @ .......
 $18.00 ............................... $2,385.00

Before the above invoice was submitted by H & O, Cumbest and Vaughan discussed it. If the jury believed Vaughan, then Cumbest told him not to put anything in this bill revealing any work had been performed by a bushhog.
At the next Board meeting, following divine invocation by another Baptist preacher, Cumbest approved this claim along with others to the county. It escaped his attention that the bill said nothing about bushhogging, or about a golf course or about a park.
District One of Jackson County did not receive 132 1/2 hours use of a John Deere dozer, as Vaughan had claimed on the H & O invoice, but Vaughan got a check for $2,385.00 on July 6, 1976, and on July 6, he also wrote Coleman a kickback check for $660.00.
What service did Jackson County receive for the $2,385.00? We do not know; we will never know. But, we know it did not receive 132 1/2 hours of the use of a John Deere dozer. How much did Vaughan keep for his "service charge" that month? We do not know this, either. But, we know Mr. Vaughan got his kickback in some amount out of this check, because he always did.
In July, 1976, Vaughan submitted several invoices to the county, and one of them did mention 86 hours rental of a bushhog at $9.00 an hour, for $774.00. When the county paid him for all invoices totaling $8,152.20, Mr. Vaughan wrote Mr. Coleman his check for $645.00. Service fee for billing: $129.00. Nothing on the invoice or records claims for work done on a golf course or park.
What did Jackson County get for this $129.00? Zero.
Vaughan had a method whereby he could know which of the invoices he submitted were false, and from which he would have to calculate and take into account what he was paying Coleman, as well as his own service charge or kickback. As stated, Vaughan did business as H & O Materials and Equipment Rentals, Inc. To identify *230 the invoice which had false charges, Vaughan simply put the figure "1" in the "O" of the "H & O" invoice letterhead.
Attention is invited to this little marking which appears with monotonous repetition on the monthly charges of H & O.
On August 26, 1976, Vaughan submitted seven invoices to Jackson County for equipment rental. None of them have any notation for bushhog rental. The invoices all state they are for equipment used on certain named county roads such as "Browning Road", "Ben Durham and Johnson" roads, "General Walker Road", "Cronier Road", etc. Nothing to indicate any work done on a golf course or park.
On September, 7 H & O was paid $18,847.00 by the county. On the same date Vaughan paid Coleman $667.50 by check.
Did Vaughan ever know whether Coleman was performing any of the bushhog work for which he was paying him each month? No. Vaughan made no effort to find out, did not consider it any of his business. It was not his concern, and he did not care.
On September 23, 1976, H & O submitted two invoices as follows:
Jackson County Road Protection Fund Rental of Martin lowboy # 4851, JD500B Backhoe loader #B153p12889

 ........... $
 6 hr's rental of lowboy @ $18.00 ..... 108.00
 77 1/2 hr's rental of JD500B Backhoe
 @ $18.00 ............................. .. 1,395.00
 ________
 $1,503.00

Jackson County, District # 1
Rental of Mich-25 ton trk crane to unload and stockpile slag at County Barn. Rental of bushhog under supervision of Co. Road Foreman

 21 Hr's rental of 25 ton Mich. trk ......... $
 Crane @ $35.00 ....................... 735.00
 21 Hr's rental of Laborers @ $6.00 ... 126.00
 78 Hr's rental of Tractor and
 Bushhog @ $9.00 ................... .. 702.00
 ______
 $1,563.00

On October 4, 1976, the county paid Vaughan a check for $3,066.00, and on the same date he wrote Coleman a check for $585.00. Service charge for billing: $117.00.
Nothing to suggest any work done on a park or golf course.
It needs to be noted that District One of Jackson County no doubt has a great number of miles of public roads maintained by the county. It is one thing for an auditor looking at records to see a charge for bushhog work on what he presumes are rights of way of public roads, and the question he would have if he knew the hours were limited to a small park and golf course.
At the trial Cumbest testified that he had never told Vaughan not to put charges for bushhogging on any H & O invoices. He said he was quite surprised to learn at trial that it had been done. His explanation was that he just looked at the total figure on each of the invoices when they were presented as claims, and somehow had overlooked the absence of any charge for bushhogging on these invoices. He might have missed seeing it on one or two, or five or six invoices, but how did he miss observing these falsities on twenty to thirty monthly invoices?
Our incredulity on this testimony is increased by an examination of Exhibit 7. On November 20, 1976, Vaughan submitted an invoice totaling $3,170.20 for rental of various pieces of equipment during the previous month. A number of pieces of equipment are listed as being rented that month on the invoice, but bushhogging is not among them. Now, the purchase clerk of the county, whenever he received an H & O invoice, had a practice, before he prepared and signed a purchase order, of requiring the appropriate county officer to sign the requisition supporting the invoice, and also a receiving report certifying the equipment had been used that month. Cumbest on November 20, 1976, signed the requisition and receiving reports for this invoice. If he could read, before he signed the requisition form and the receiving report, he saw *231 the invoice made no charge for bushhog rental.
After receiving the county's check on this and another claim, Vaughan wrote Coleman a check for $330.00 on December 6, 1976. Also escaping Cumbest's attention was the false representation on the invoices that the equipment was used entirely on county roads and bridges. They stated nothing about equipment being used on a park or golf course.
Cumbest knew he had no legal authority whatever to:
(a) rent equipment to bushhog a golf course or park;
(b) rent equipment at all without first putting an order on the minutes of the Board showing the public need for such rental and when it was to be used;
(c) prepare, fill in and sign a requisition, and a purchase order after, not before, the service was rendered and the invoice was submitted;
(d) approve any claim which had false information written on it.
With this knowledge in his head, it would certainly appear he would say something like this to himself: "All this violates the law, but, if it is ever questioned, I am going to make sure that I can say to the whole world, `this may not have been exactly legal, but Jackson County never lost a penny by this way of handling public money'."
According to my two colleagues, the more ignorant Mr. Cumbest chose to remain, the more innocent he was!
Of course, it was for the jury on this issue to determine whether it wished to believe Cumbest or Vaughan. This was the only point in the testimony of Cumbest, Coleman, and Vaughan in which there was not complete agreement among the three of them.
Why would Vaughan care whether he billed the county for bushhogging or not? He did on all the invoices paid for out of District Two funds. What other reason would he have, other than he was following the instructions of Cumbest?
It is true, that with the exception of this one exhibit, Coleman signed virtually all the remaining requisitions and receiving reports. Coleman signed the requisitions and receiving reports which enabled the H & O invoices to be submitted to the Board of Supervisors. Then, Vaughan paid him for the bill which he, Coleman, submitted to Vaughan. What a good arrangement for the county to be sure and get its money's worth.
And of course, at the monthly meeting of the Board of Supervisors, it was the duty of Cumbest to examine each bill from his District for accuracy.
Here is what Miss. Code Ann. § 19-13-31 (1972) states as the obligation of the Board of Supervisors, in pertinent part:
All claims found by the board to be illegal, and which cannot be made legal by amendment, shall be rejected or disallowed. All other claims shall be audited, and all those found proper upon due proof shall be allowed ... [Emphasis added]
Here is what Miss. Code Ann. § 19-13-33 (1972) states, in pertinent part:
It shall be unlawful for the board of supervisors to allow a greater sum for any account, claim, or demand against the county than the amount actually due thereon, dollar for dollar, according to the legal or ordinary cash compensation for such services rendered, ...
"Audit" means to examine and verify. If we take Cumbest at his own word, he totally ignored his obligation under these statutes.
According to the argument of my colleagues, since Mr. Cumbest failed to do his duty, he therefore did not know what was going on, and therefore should not be prosecuted for fraud.
Well, according to Vaughan, he did know what was going on. Indeed, according to Vaughan, Cumbest was the director of the manner of submitting the claim.
*232 On December 20, 1976, another invoice was submitted:

 ....... $
 12 Hrs' rental of lowboy @ $18.00 ........ 216.00
 57 Hr's rental of JD500B Backhoe
 loader ................................... 1,026.00
 88 Hr's rental of 15-B Dragline @
 $20.00 ................................... 1,760.00
 ________
 $3,002.00

Nothing about any bushhog. Nothing about any of the work being done on a golf course or park. On January 3, 1977, after he had been paid on this bill, Vaughan wrote Coleman a check for $375.00 for all the bushhogging he did in December.
The state's witnesses who operated the bushhog for Coleman said they did no bushhogging in the winter months.
When Vaughan sat down with Cumbest and told him Coleman was putting in a charge for $375.00 for bushhogging the verdant bushes, grass and weeds in December, 1976, Cumbest, in sublime ignorance of what was going on told him to put it in the county's bill, but not to mention bushhogging.
On January 20, 1977, Vaughan submitted another invoice to the county. Among other items of equipment it did include 40 hours' rental of tractor and bushhog at $12.00 totaling $480.00. The tractor H & O claimed to have used, however, with the bushhog was a John Deere, while Coleman's was a Ford. We do not know whether H & O also had a John Deere, while Coleman's was a Ford. We do not know whether H & O also had a John Deere bushhog rented to the county that month on other work, but we know Coleman got a check on February 7, 1977, for $375.00. If it was the same, Vaughan got a service fee of $105.00 for billing.
In February, 1977, H & O submitted another bill to the county which did include 52 hours for use of John Deere tractor and bushhog at $12.00 per hour, totaling $624.00. He paid Coleman $375.00 by check on March 7, 1977. If the two are the same, it means that for twelve hours a week the bushhog worked on grass and weeds in February, and Vaughan got a service fee for his billing of $249.00. How much benefit to Jackson County was this $249.00? Zero.
Trial Exhibit 12 contains a detailed invoice dated April 26, 1977, from H & O to the county for work done on the "County Acres Road". It lists eleven different pieces of equipment used. Nothing is said about a bushhog. Nothing is said about any work on a golf course or park, but it does have the "1" in the "O". Total invoice: $5,341.25. On May 2, 1977, Coleman got his check for $510.00.
Concealed in that invoice is at least a $510.00 lie, which Vaughan said Cumbest knew about. Even if you accepted the incredible testimony of Cumbest that he somehow "overlooked" the absence of any mention of a bushhog, he most assuredly knew, because Vaughan had told him so just a few days previously that $510.00 for work claimed to have been done on County Acres Road was never performed.
Trial Exhibit 13 likewise contains several H & O invoices. None mentions bushhog. None indicates any work done on a golf course or park. The county paid H & O $9,265.25 on June 1, 1977. Vaughan wrote Coleman a check for $645.00 on June 7, 1977. Somewhere in those invoices there is hidden the $645.00 payment to Coleman, the kickback to Vaughan of at least another $150.00, and which my colleagues characterize only as poor bookkeeping.
Trial Exhibit 15 contains six invoices in July, 1977, from H & O totaling $8,242.00. None of them shows bushhogging. None indicates any work done on a golf course or park.
Vaughan paid Coleman $830.00 by check dated August 1, 1977.
Because the originals of his old records had been destroyed or lost, Vaughan had none of the tickets he had received from Coleman prior to August, 1977. Trial Exhibit 16 is the first exhibit which includes a *233 ticket. In August, 1977, Vaughan submitted four invoices to the county, totaling $11,324.25. All list specific roads on which the labor and equipment was used, and three invoices have the "O" checked.
Coleman received a check dated September 6, 1977, from Vaughan in the amount of $880.00.
The ticket was a grocery charge slip on which was written:

 8/22/77
 H & O Material
 118 hrs. @ $7.50 $ 7.50
 bushhogs work 880.00
 /s/ Dale Coleman

At the next regular meeting of the Board of Supervisors, following invocation of divine blessing by the local Assembly of God pastor, Cumbest approved this claim along with other county claims.
Trial Exhibit 17 contains two invoices dated September 20, 1977, for work done on the Toxie Miller Road and the River Lodge Road. Each lists at least seven pieces of equipment and hours of use of each during the month. Neither mentions bushhog rental, and neither states anything about any work on a golf course or park. The invoice which has the "O" marked with the "1" totals $1,686.00. After Vaughan got the county check dated October 1, 1977, he gave Coleman a check for $720.00 dated October 3, 1977.
Coleman's handwritten ticket:

 9/20/77
 H & O Material
 96 hrs. bushhog work $720.00
 /s/ Dale Coleman

This means that Cumbest, at the next Board meeting, looked at a claim for $1,686.00 which Vaughan had already told him contained at least $1,000.00 in false charges that were never performed by Vaughan or his company. And, Cumbest was content for this to forever remain a secret just among him, Vaughan and Coleman. It was not Cumbest's fault this little arrangement ever came to light.
Yet my colleagues can discern no evidence from which this jury could have found knowledge and intent to deceive.
Exhibit 17A bears some comment. Vaughan testified that the rental charge of his equipment included the personnel to operate it. Of course, it also included gas, diesel oil and oil, as well as the wear and tear, and depreciation of equipment. Insofar as the bushhog on the park and golf course were concerned, Vaughan's equipment was not used, he was out no money for oil or gas, or to pay operators. The county fuel tanks furnished Coleman's tractor, and Coleman's friends and neighbors were the operators. All Vaughan did in reference to Coleman's charge was disguise it to the county under a rigged bill.
What did Vaughan get for engaging in this duplicity? To charge the county the same rate as if his equipment, his personnel, and his gas and oil were being used.
What right or basis could he and Cumbest have to charge the county H & O's hourly rental rate for use of bushhog when no H & O bushhog was used and no H & O employee operated it? None whatever.
Now, let us look at Exhibit 17A. Here is an invoice dated October 21, 1977, in which there is listed:

 86 hrs. rental of JD830 Bushhog @
 $12.00 $1,032.00

Vaughan testified he put the same number of hours on the invoice as was on the ticket from Coleman. Coleman's ticket:

 10/20/77
 H & O Material
 86 hrs. bushhog work $645.00

So, Vaughan paid $645.00 to Coleman and retained $387.00 out of the $1,032.00 for his billing services.
The invoice claims to be for work on a county road and at the county barn. Nothing *234 on it suggests any work on a golf course or park.
At the next regular Board meeting, following invocation of divine blessing by a local Baptist pastor, Cumbest approved this bill along with other claims against the county.
Exhibit 18 contains an invoice to the county dated November 21, 1977, for rental of a crane at the county barn in Hurley to move slag. It states:

 105 Hr's rental of 15-B Crane @
 $20.00 $2,100.00

This invoice is inflated to include Coleman's ticket for $615.00 for 82 hours bushhog work, which Vaughan paid Coleman by check on December 5, 1977.
Exhibit 19 contains an invoice dated December 22, 1977, totaling $1,767.75. Five pieces of equipment are listed as having been used, but no bushhog is mentioned. Nor is there anything said about work being performed on a golf course or park.
This invoice is inflated to include Coleman's ticket dated December 20, 1977, for $645.00 for "86 hrs. bushhog work", which Vaughan paid Coleman by check dated December 31, 1977.
Coleman's friends and neighbors, who he employed to operate the bushhog on the park and golf course, all testified the machine was only operated in the months of May, June, July, August and September, and then only two to three hours a day for not over five days a week.
When Messrs. Vaughan and Cumbest sat down to discuss Coleman's charge of 86 hours operating that bushhog in December, over 20 hours a week, we must admire Mr. Cumbest's faith in his road foreman's ability to operate a machine efficiently.
When asked why he would do this sort of thing, Vaughan replied Cumbest had asked him to do it, his company did a lot of work for the county, and he "didn't mind doing it. I had a contract price for the County, regardless of who did the bushhog work. The county was going to pay my contract price for it." [Emphasis added]
Trial Exhibit 20 contains an invoice dated January 23, 1978, for rental of several pieces of equipment totaling $3,403.00. No bushhog is mentioned. Nothing is said about work on a golf course or park.
This invoice was inflated to include Coleman's ticket dated January 20, 1978, for $645.00 for "86 hrs. bushhog work".
When Messrs. Cumbest and Vaughan sat around the stove to discuss the January bill H & O was going to submit to the county, what did they have to say about the 22 hours a week spent the previous month cutting grass and weeds on the golf course and park?
Mr. Vaughan testified there was no need for his bushhogs that time of year, except "for clearing land or something". So, Coleman was "clearing land or something" all those 86 hours in January, 1978.
Incidentally, there are no doubt well in excess of one hundred miles of public county roads in District One of Jackson County. No particular attention would be excited showing bushhog work on road rights of way, and in a substantial number of hours. If these same hours had been shown to have been on the golf course and park, however, eyebrows would have been lifted.
Trial Exhibit 21 contains an invoice dated February 22, 1978, for rental of several pieces of equipment totaling $1,980.00. No bushhog is mentioned. Nothing said about work on a golf course or park.
The invoice was inflated to include Coleman's ticket dated February 21, 1978, for $645.00 for "86 hrs. bushhog work". Vaughan paid Coleman $645.00 by check dated March 6, 1978, and, of course, got his kickback as well as some additional amount for the billing service.
If Vaughan had not been caught, these under-the-table dealings among Vaughan, *235 Cumbest and Coleman would still remain a secret.
Trial Exhibit 22 contains an invoice to the county dated March 22, 1978, for rental of several pieces of equipment, totaling $2,855.00. Nothing is said on the invoice about a bushhog, and nothing is said about work on a golf course or park. This invoice is inflated to include a ticket from Coleman for $615.00 for 82 hours bushhog work in March, 1978.
Trial Exhibit 23 contains an invoice to the county dated April 22, 1978, for rental of several pieces of equipment and sale of 240 cubic yards of reef shells, totaling $4,808.00. Nothing in the invoice states anything about a bushhog, or about any work being performed on a golf course or park. This invoice is inflated so as to conceal and hide a ticket from Coleman for $645.00 for 86 hours of bushhog work in April, 1978.
My two colleagues assert this was simply some poor bookkeeping on the part of Cumbest. I would say it is about the best bookkeeping imaginable for anyone trying to decieve. Indeed, if Vaughan had not spilled the beans, the world would no doubt still be in the dark about these rigged invoices, rigged requisitions, rigged receiving reports, and rigged purchase orders.
If Mr. Cumbest had an honest intent, why would he month after month engage in this sort of deception?
On the other hand, if he wished to have a scheme where the county could be ripped off and Coleman paid a monthly sum, Vaughan paid a monthly kickback, and nobody be the wiser, it is harder to envision a more masterful job than this.
This claim was also approved along with other claims at the next Board meeting, following the invocation of divine blessing by a local minister.
Trial Exhibit 24 is illustrative. That month, on May 22, 1978, Coleman gave Vaughan two tickets, one to be paid from District One and the other from District Two. They are:

 5/22/78
 H & O Material
 B #1[*]
 88 hrs bushhog work $660.00
 /s/ Dale Coleman
 and
 5/22/78
 H & O Material
 Golf Course B #2[*]
 54 hrs. bushhog $405.00
 /s/ Dale Coleman

[*] The "B #1" and the "B #2" on the tickets are written smaller and dimmer than the rest of the writing on the tickets.
The ticket for $660.00 for 88 hours was paid by District One funds. H & O, with the "O" containing the usual "1", invoiced the Revenue Sharing Fund of District One on May 25, 1978, for $8,664.50 for rental of numerous pieces of equipment, a foreman, and laborers, for their use on roads in Helena and North Escatawpa. The invoice does not mention use of any bushhog, and of course specifically states the equipment was used on county roads.
In this invoice was concealed what Vaughan was going to pay Coleman, namely: $660.00, as well as what he was going to keep as his billing service charge.
The other invoice was paid from District Two funds. It is dated May 20, 1978, and states the following:
Rental of JD Diesel tractor and Bushhog # XXX-XXXXXX on County Golf Course at Big Point

 54 hrs. rental of tractor and Bushhog at
 $12.00 .................................. $648.00

Thus, the billing to District Two coincided with Coleman's charges and where the bushhog was used. The only difference was in the brand name of the tractor. H & O used John Deere tractors, Coleman's was a Ford. On this invoice Vaughan got $648.00 from the county, paid Coleman $405.00, and retained $243.00 service fee for his billing.
If Vaughan used the same arithmetic on District One that month, then he charged District One $12.00 per hour for 88 hours, *236 or $1,056.00. This means that hidden, falsified in the $8,664.00 charge to District One, is $1,056.00 that the county never received from H & O. District One perhaps got  at the very most  20 hours bushhog work for which it would have owed Coleman $150.00. Yet, Coleman was paid $660.00 for those when, given every benefit of a doubt, at most he was owed $150.00. Vaughan was paid $396.00 for absolutely nothing.
If the jury chose to believe Vaughan, which they had a right to do, Vaughan and Cumbest discussed how these tickets of Coleman would be paid. Cumbest instructed Vaughan to disguise the charge. The official of Beat Two, on the other hand, had no objection to Vaughan billing the county the same hours and the same work as he was billed by Coleman.
So much for the contention there was no showing of an intent on the part of Cumbest to deceive.
If paying Vaughan these charges when no service whatever was rendered by H & O to the county are not frauds, then what is?
Trial Exhibit 25 contains two tickets, each dated June 20, from Coleman, one for $697.50 for 95 hours, which was covered by a District One invoice, and the other for $547.50 for 73 hours, which was covered in a District Two invoice. The invoice to District One is dated June 23, and is for the rental of equipment on certain named county roads, and lists numerous items of equipment, the charge totaling $9,974.50. Nothing is said about a bushhog on the invoice.
The other invoice to Rivers and Harbors Fund, dated June 20, 1978, and totaling $2,319.00, states nothing about a bushhog, either.
Vaughan testified Cumbest told him to prepare these invoices as he did. From these two tickets, Coleman, on June 20, was claiming his bushhog had operated a total of 168 hours the previous month. That is, for 30 days straight that bushhog had averaged 5.6 hours a day.
No wonder Cumbest told Vaughan to conceal the bushhogging pay-off from his H & O invoices.
Trial Exhibit 26 contains the same procedure as shown in Trial Exhibit 24. That is, there are two tickets, each dated July 20, 1978, one for $772.50 for 103 hours of work directed to Beat One, and the other for $585.00 for 78 hours of work, directed to Beat Two.
H & O's invoice to District One dated July 21, 1978, totaling $9,143.00 states nothing about any bushhog being rented, or a golf course or park. The other invoice, dated July 20, 1978, directed to District Two (the "O" in the H & O has a "2" in it) states it is for 78 hours rental of a bushhog at the County Golf Course at Big Point, at $12.00 per hour, totaling $936.00. Thus, on this second invoice we know Vaughan got a billing fee of $351.00 for no service rendered the county. On the first invoice, using the same arithmetic, Vaughan got a billing fee of $463.50 for which Jackson County got absolutely nothing.
I wonder, when Vaughan told Cumbest that Coleman claimed to have put in 181 hours bushhogging the park and golf course the previous month, what the reply was. That averaged 6.3 hours every day for the previous 30 days. Some machine. Some road foreman.
Trial Exhibit 27 contains invoices to Districts One and Two for August, 1978, with the same procedure followed as in Exhibits 24 and 26.
Coleman's ticket to be paid by District Two was for 84 hours totaling $630.00. H & O's invoice to District Two was for 84 hours bushhog work on the County Golf Course at Big Point at $12.00 per hour for $1,008.00. Thus, a billing fee for zero services of $378.00.
Coleman's ticket to be paid by District One was for 104 hours, totaling $780.00. The H & O invoice to District One, dated August 23, 1978, stating nothing about any bushhog, is for $3,724.00. Thus, $1,248.00 of District One's bill was false. And, Vaughan *237 got a billing fee of $468.00 for which Jackson County got zero.
When Cumbest and Vaughan talked about Coleman's charge for August, Cumbest learned Coleman was claiming 188 hours bushhog work on the golf course and park the previous month. Must we repeat the sad story?
Trial Exhibit 28 contains an invoice to District One dated September 21, 1978, for equipment rental, totaling $3,352.00. Nothing is in it about any bushhog rental, or golf course or park. Following payment by the county of $3,352.00 on October 1, Vaughan paid Coleman's ticket for $810.00 for 108 hours bushhog work. Another hidden pay-off, if the jury believed the state's witnesses, at least 50 of the 108 hours claimed were false. Yet, Cumbest was not supposed to know any better when Vaughan told him what he and Coleman were charging the county.
Trial Exhibit 29 is a repeat of Exhibit 28. On October 20, 1978, Coleman gave Vaughan a ticket for $840.00 for 112 hours of bushhog work. H & O's invoice to District One, dated October 25, totaling $4,328.25, again omits the pertinent information. Over $1,000.00 of this invoice is clearly false. According to the state's witnesses, no bushhogging was done following September. This knowledge somehow escaped Cumbest.
Trial Exhibit 30 is a repeat of Exhibits 28 and 29. Coleman on November 22, 1978, gave Vaughan a ticket for $840.00 claiming 112 hours bushhog work in November. That month H & O submitted an invoice to District One for $10,342.25 for equipment rental, with the pertinent information again omitted. Another $1,000.00 which might as well have been thrown into a fire, insofar as Jackson County was concerned.
Trial Exhibit 31 shows Coleman on December 18, 1978, giving Vaughan a ticket for $795.00 for 106 hours bushhog work the previous month. H & O's invoices to the county state nothing about any bushhog, golf course, or park. The county paid H & O $4,162.50 on January 1, 1979. On January 2, 1979, Vaughan wrote Coleman a check for $795.00.
According to my colleagues, there was no showing Cumbest had any reason to suspect Coleman did not put in 106 hours on that bushhog in the balmy month of December, 1978.
Really, I cannot say who has tendered the greater insult to Cumbest, the jury which found him guilty of fraud, or my two distinguished colleagues, who apparently think he was an imbecile. That is not a very good choice to give Mr. Cumbest, but I believe I would prefer the former.
Trial Exhibit 32 reveals Coleman gave Vaughan a ticket on January 19, 1979, for $787.50 for 105 hours bushhog work the previous hot month when all the bushes, weeds and grasses were bursting forth in growth. The H & O invoice to the county makes no mention of a bushhog, golf course or park. After H & O was paid $4,411.70 by the county on February 5, 1979. Vaughan gave Coleman his check for $787.50.
Oh, somewhere in those innocent appearing records $1,000.00 floats in the thin air.
At the next regular meeting of the Board, following divine invocation by the local Methodist minister, Cumbest approved this claim of H & O along with the other county claims.
Trial Exhibit 33 is another repeat. On February 20, 1979, Coleman gave Vaughan a ticket for $765.00 for 102 hours bushhog work. Again, the invoices to the county neglected to inform the auditor that any charges thereon were for bushhog, golf course or park. Out of $3,181.00 Coleman got his $765.00.
Trial Exhibit 34 repeats the same procedure. On March 21, 1979, Coleman gave Vaughan his ticket for $780.00 for 104 hours bushhog work. On March 27, 1979, H & O invoiced the county for equipment rental for $4,060.00.
In accordance with Cumbest's usual instructions, the invoices state nothing about any bushhog rental. And, of course, nothing is said about a golf course or park.
*238 Trial Exhibit 35: April 23, 1979, a Coleman ticket for $855.00 for "114 hrs. bushhog work". H & O invoice to Jackson County for District One, dated April 26, 1979, for $8,887.70. No bushhog mentioned in the invoice, or golf course, or park.
H & O was paid $8,887.70 by county check on May 1, 1979. And Coleman was paid $855.00 by Vaughan by check on April 30, 1979. After that many months, Vaughan apparently felt he could safely pay Coleman before he got his check from the county.
Trial Exhibit 35A follows the same procedure as Trial Exhibits 24, 25, 26, 27 above set forth. That is, there were two tickets from Coleman dated May 21, 1979, one to H & O to be paid by District One for 84 hours bushhog work totaling $630.00, and the other to H & O to be paid by District Two for 74 hours bushhog work totaling $555.00. The District Two Recreation Fund was invoiced by H & O for 74 hours tractor and bushhog rental at $12.00 per hour, totaling $888.00. Thus, Vaughan made a profit of $333.00 from District Two.
H & O's invoice to District One dated May 21, 1979, totaling $11,684.75 states nothing about bushhog, golf course, or park. The usual arithmetic reveals District One's invoice was bloated $1,008.00. Nothing here to excite Mr. Cumbest's attention.
Trial Exhibit 36 follows the same procedure as Trial Exhibits 24, 25, 26, 27, and 35A. Two tickets were from Coleman dated June 20, 1979, one to H & O to be paid by District One for 86 hours "bushhog" totaling $645.00, and the other to H & O to be paid by District Two for 84 hours "bushhog" totaling $630.00. H & O's invoice to be paid for by District Two states it is for 84 hours rental of diesel tractor and bushhog at $12.00, totaling $1,008.00.
The H & O invoice to District One dated June 22, 1979, for equipment rental on the Johnson and John Holder roads states nothing about any bushhog rental. It totals $13,557.50. Thus, $1,132.00 of this invoice is false. $645.00 of the $1,132.00 went to Coleman and Vaughan got $487.00, not for equipment rental, but as a billing service he kindly rendered District One, Jackson County.
Trial Exhibit 38 follows the same procedure as the exhibits noted. Two tickets were from Coleman to H & O, dated August 23, 1979. The ticket to be paid by District One was for $920.00, "96 hrs. bushhog work". The ticket to be paid by District Two was for $720.00, "72 hrs. bushhog work". H & O's invoice to District Two that month is for 72 hours rental of tractor and bushhog at $12.00 per hour, totaling $864.00.
H & O's invoice to District One that month, totaling $2,504.50, makes no mention of a bushhog, or golf course, or park. Out of this invoice, $1,152.00 or about one-half, was false. Coleman got $720.00 from Vaughan and Vaughan got the remainder of the $1,152.00 for his billing fee.
Trial Exhibit 37 also contains two tickets dated July 20, 1979, a ticket to H & O to be paid from District One for "136 hrs. bushhog work" for $1,020.00, and a ticket to H & O to be paid from District Two for "112 hrs. bushhog" for $840.00.
Again we find H & O invoicing District Two and stating a charge for 112 hours rental of a Ford tractor and bushhog at $12.00 per hour, for $1,344.00.
The H & O invoice to District One that month, totaling $8,065.40, states nothing, however, about any bushhog, golf course, or park.
Thus, $1,532.00 of the $8,065.40 charge is false. Out of the $1,532.00 Coleman got $1,020.00 and Vaughan the rest for his customary billing service.
That month, when Vaughan told Cumbest that Coleman was claiming a total of 248 hours bushhog work on the golf course and park, an average of 8.2 hours for every day the previous 30 days, the jury no doubt wondered why this did not excite Cumbest's curiosity. This was especially interesting that particular month because the weather records revealed this to have been *239 one of the heaviest rainy spells in the history of Jackson county.
It is also of interest to me that my colleagues in their dissent seize upon a defense that even Cumbest never claimed at trial, namely: that there was no proof Cumbest knew what was going on.
Mr. Cumbest at trial never once testified he had paid these claims through ignorance of the true facts. According to him, he was very familiar with the park and golf course. They were in his district. Indeed, at trial Cumbest insisted the county got its full money's worth from these charges, in fact, he said the charges were reasonable.[1a]
Of course, the state never claimed Cumbest kept a clock on Coleman's tractor. Yet, Cumbest never claimed or intimated to the court and jury: ladies and gentlemen, these charges may be exorbitant, but I paid them through ignorance. If they are too high, and it certainly appears to me now at trial that they are, then I want to make amends. I recognize my civil liability, but I am not guilty of an intentional fraud. We never heard anything like this from his testimony.
ROY NOBLE LEE, Presiding Justice, specially concurring:
I concur with the majority opinion and emphasize the correctness of the opinion on two questions.

I.
While it is difficult to define fraud, since fraud involves breach of duty, trust, confidence, and includes all acts, omissions, or concealments by which another is injured, or an undue and unconscientious advantage is taken,[1] in my view, the evidence, together with all reasonable inferences, made out a guilt question for the jury to determine. In Jackson v. State, 440 So.2d 307, 310 (Miss. 1983), we stated the rule on motions for directed verdict as follows:
In considering the question of whether or not a directed verdict or a peremptory instruction should have been granted for the appellant, the reviewing court must consider as true all the evidence introduced, which is favorable to the State, together with all reasonable inferences to be drawn therefrom, and, if they present an issue for determination by the jury, then the case must be submitted to the jury and will not be disturbed, if that evidence and those inferences support the guilty verdict. (Citations omitted).
See also Warn v. State, 349 So.2d 1055 (Miss. 1977).

II.
The appellant contends that the indictment is vague, indefinite, and uncertain in that it fails to set forth the essential elements of the crime charged, fails to establish a standard by which the appellant or the jury could determine what acts constituted "false or fraudulent claims" and that the demurrer should have been sustained. The indictment charges the following essential elements:
(1) That appellant "did unlawfully, willfully, knowingly, fraudulently and feloniously defraud Jackson County ... of the approximate sum of Fifty Thousand Seven Hundred Fifty Three Dollars and Forty Cents ($50,753.40) ... the property of Jackson County... ."
(2) That appellant, "the duly elected and sworn supervisor, Beat 1, Jackson County, ... entrusted with the public funds of Jackson County, Mississippi, ... by virtue of his position as supervisor, ...
(3) and Dale Coleman, employee of Beat 1, Jackson County, ... unlawfully, knowingly and feloniously submitted to or caused to be submitted to Jackson County ... for payment by Jackson County ... monthly false or fraudulent claims from H & O Materials & Eq. Rental, Inc... . for payment to H & O Materials & Eq. Rental *240 for equipment rental, to-wit, one tractor and bushhog ...
(4) property of Dale Coleman, knowing such claims to be false or fraudulent and not owed by Jackson County to H & O Materials & Eq. Rental or Dale Coleman, ...
(5) with their fraudulent intent, then and there, to unlawfully, willfully, and feloniously cheat and defraud the said Jackson County, Mississippi, ... .
(6) all in violation of Section 97-11-31 of the Mississippi Code of 1972, Annotated, as amended.
(7) By way of evidence and example of said false or fraudulent claims, attached hereto and incorporated herein is Exhibit No. 1, being one of a series of false or fraudulent claims, ... submitted by H & O Materials & Eq. Rental to Jackson County, ... as set out above, ... ."
The purpose of the indictment is to inform the accused of the nature and cause of the charge against him in order that he may present his defense to that charge. In Blakeney v. State, 228 Miss. 162, 87 So.2d 472 (1956), Blakeney, a supervisor of District 2, Smith County, Mississippi, was indicted under the identical section here. In addressing the question of a demurrer to the indictment, the Court said:
The indictment against the appellant Ance Blakeney, omitting the formal parts, charged him with having willfully, unlawfully, feloniously and fraudulently, in August, 1953, and while acting as the elected and qualified Supervisor of District No. 2 of Smith County, Mississippi, employed one Earnest Blakeney (a distant relative) to work upon the public roads of District No. 2 of Smith County, at the rate of $5 per day, and did, while having the said Earnest Blakeney so employed, order and direct him to perform seven and one-half days work on the private farm owned and operated by the said Ance Blakeney, doing general farm work for the use and benefit of Ance Blakeney, and that he did willfully, unlawfully, feloniously and fraudulently pay Earnest Blakeney for said seven and one-half days labor with the funds of District No. 2 of Smith County, Mississippi, by means of a regular road and bridge fund warrant of the said district, in violation of Section 2123, Code of 1942, which code section is hereinbefore fully quoted.
We have concluded that although the indictment is not drawn so as to fully inform the accused of all of the details of his alleged offense, it is sufficient to adequately state the nature and cause of the accusation against him, and that therefore there was no error committed by the trial court in overruling the demurrer to the indictment. [228 Miss. at 168, 87 So.2d at 473].
In Sanders v. State, 141 Miss. 289, 105 So. 523 (1925), Sanders, County Superintendent of Education, Sunflower County, Mississippi, was indicted for unlawful conversion, not the fraudulent and felonious conversion of county funds. However, it is interesting to note that the Court stated:
It was not necessary to charge in the indictment the sources of the different funds in appellant's custody as county superintendent, if, in fact, there were funds coming from different sources. It was sufficient to put him on notice of the nature and cause of the crime he was to meet to charge as the indictment did, that so much funds came into his hands by virtue of his office which he embezzled. [141 Miss. at 303, 105 So. at 525].
It was not necessary to the validity of the indictment that Exhibit # 1, as an example of the false and fraudulent claims charged, be attached thereto. It was affixed to the indictment to further inform and acquaint the accused with the charge(s) against him. Evidence, which will be introduced at trial, is not properly placed in the indictment. The evidence and details surrounding the charge, could have been procured by discovery (motion to produce).
*241 Therefore, in my opinion, the indictment adequately informed appellant of the charge against him, was not so vague, indefinite and uncertain as to be demurrable, and the evidence adduced upon the trial of appellant was sufficient to support the verdict of the jury.
PATTERSON, C.J., joins in this opinion.
WALKER, Presiding Justice, dissenting:
I respectfully dissent from the majority as I am of the opinion that the verdict of the jury finding Mr. Cumbest guilty of perpetrating a fraud upon Jackson County in violation of Mississippi Code Annotated section 97-11-31 is contrary to the overwhelming weight of the evidence. Although much was left to be desired with respect to his record-keeping procedure pertaining to County work performed by subcontractors, I can find no direct evidence in this record that Cumbest intended to defraud the County, or that he knew that Dale Coleman, his road foreman, was submitting false claims for work that was never performed. Neither do I find any combination of evidence from which it could be reasonably inferred beyond a reasonable doubt that Cumbest was guilty of the charges.
Under our jurisprudence, a person is not held criminally liable for simple acts of negligence or loose business practice, although those things are not desirable.
For a person to be convicted of fraud, the State must prove beyond a reasonable doubt that he intended to defraud. In my opinion there is no such proof here and the judgment and sentence imposed on Cumbest should be reversed and the appellant discharged.
Furthermore, the judgment and conviction should be reversed for two other reasons.
First, the demurrer to the indictment should have been sustained because it charged the offense of fraud in general terms leaving it vague, indefinite and lacking in particularity.
The Supreme Court of the United States, speaking to the Sixth Amendment Right of an accused to be fully informed set forth the minimum constitutional requirements of an indictment drawn under a statute similar to Mississippi Code Annotated section 97-11-31, being the one under which the defendant was charged, said in United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588 (1876) that:
It is an elementary principle of criminal pleading, that where the definition of an offense, whether it be at common law or by statute, "includes generic terms, it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition; but it must state the species; it must descend to particular."
The statutory language of section 97-11-31 dealing with fraud in office, is in generic terms. Therefore, it is not sufficient to allege the offense in similar generic terms, i.e., "the fraud was committed by the submission of false and fraudulent claims". Absent allegations in the indictment stating in specific terms wherein the claims were false and fraudulent, the indictment was subject to a demurrer.
The indictment against Cumbest (and Coleman) reads as follows:
In the Circuit Court in and for said County at the APRIL Term thereof, in the year of our Lord, 1981, being recalled June 15, 1981.
THE GRAND JURORS of the State of Mississippi taken from the body of the good and lawful Jurors of said County, duly elected, empaneled, sworn and charged, at the Term aforesaid of the Court aforesaid, to inquire in and for the body of the County aforesaid, in the name and by the authority of the State of Mississippi, upon their oaths present: That LUM CUMBEST, a duly elected and sworn supervisor, Beat I, Jackson County, Mississippi, and DALE COLEMAN, employee of Beat I, Jackson County, Mississippi, late of the County aforesaid, on or between the dates of April 1, 1976, and October 31, 1979, in the County *242 aforesaid, did unlawfully, willfully, knowingly, fraudulently and feloniously defraud Jackson County, Mississippi, a political subdivision of the State of Mississippi, of the approximate sum of Fifty Thousand Seven Hundred Fifty Three Dollars and Forty Cents ($50,753.40) in good and lawful currency of the United States of America, the property of Jackson County, Mississippi, in that Lum Cumbest, duly elected and sworn supervisor, Beat I, Jackson County, Mississippi, entrusted with the public funds of Jackson County, Mississippi, by virtue of his position as supervisor, Beat I, Jackson County, Mississippi, and Dale Coleman, employee of Beat I, Jackson County, Mississippi, unlawfully, knowingly and feloniously submitted to or caused to be submitted to Jackson County, Mississippi, or approved or caused to be approved for payment by Jackson County, Mississippi, monthly false or fraudulent claims from H&O Materials & Eq. Rental, Inc., a Mississippi Corporation, for payment to H&O Materials & Eq. Rental, for equipment rental, to-wit: one (1) tractor and bushhog, the property of Dale Coleman, knowing such claims to be false or fraudulent and not owed by Jackson County, Mississippi, to H&O Materials & Eq. Rental or Dale Coleman, with their fraudulent intent, then and there, to unlawfully, willfully and feloniously cheat and defraud the said Jackson County, Mississippi, a political subdivision of the State of Mississippi, of the approximate sum of Fifty Thousand Seven Hundred Fifty Three Dollars and Forty Cents ($50,753.40), all in violation of Section 97-11-31 of the Mississippi Code of 1972 Annotated, as amended. By way of evidence and example of said false or fraudulent claims, attached hereto and incorporated herein is Exhibit No. 1, being one of a series of false or fraudulent claims, submitted by H&O Materials & Eq. Rental to Jackson County, Mississippi, as set out above, (H&O Materials & Eq. Rental, Inc., a Mississippi Corporation, referred to herein is one and the same as H&O Materials and Equipment Rental, Inc., a Mississippi Corporation.), against the peace and dignity of the State of Mississippi.
It can readily be seen that the indictment fails to state in what manner the claims were fraudulent and why the claims were not owed by Jackson County. A person reading this indictment has no way of knowing in what particular the claims were allegedly false or fraudulent and therefore is not informed as to what the State will attempt to prove against him.
The insufficiency of the indictment is compounded by the fact that the State introduced thirty-nine invoices covering a period of time between the dates of April 1, 1976 and October 31, 1979, although the indictment only referred to one of the alleged fraudulent claims, stating:
By way of evidence and example of said false and fraudulent claims, attached hereto and incorporated herein is Exhibit No. 1, being one of a series of false or fraudulent claims, submitted by H&O Materials & Eq. Rental to Jackson County, Mississippi, as set out above, ...
Even then, the indictment does not state in what particular the one claim that is attached to the indictment is fraudulent or false.
Secondly, the lower court compounded the error by granting State's Instruction Number S-4 which reads as follows:
The Court instructs the Jury that the Defendants have been charged by an indictment with Fraud committed in public office.
If you find from the evidence in this case beyond a reasonable doubt that the Defendant, Lum Cumbest, duly elected and sworn supervisor of Beat I, Jackson County, Mississippi, and Dale Coleman, an employee of Beat I, Jackson County, Mississippi, did, on or between the dates of April 1, 1976, and October 31, 1979, in Jackson County, Mississippi, unlawfully, willfully, knowingly, fraudulently and feloniously defraud Jackson County, Mississippi, of lawful monies of the U.S. in excess of $100.00, the property of Jackson *243 County, Mississippi, in that they unlawfully, willfully, knowingly and feloniously submitted to or caused to be submitted to Jackson County, Mississippi, or approved or caused to be approved for payment by Jackson County, Mississippi, false or fraudulent claims from H&O Materials and Equipment Rental, Inc., knowing said claims to be false or fraudulent, and with their fraudulent intent, then and there, to unlawfully, willfully and feloniously cheat and defraud the said Jackson County, Mississippi, of said monies, then it is your sworn duty to find the Defendants guilty as charged.
This instruction allowed the jury to grope in the dark and sift through all of the thirty-nine claims which were alleged to be false and fraudulent looking for a single sum in excess of $100.00 which they considered to be false or fraudulent without any instruction as to what would constitute a false and fraudulent claim.
One can see from a reading of the instruction that the jury had no guideline as to what constituted a false or fraudulent claim. How were the jurors to determine if a claim was false? Under this instruction, each juror could judge a particular claim by different standards from the other jurors. This could lead to twelve different standards being applied.
The unanswered question is: "Which claim was fraudulent and in what manner was it fraudulent?" The claim referred to in the indictment, i.e., Claim Number 1, was not established by the record to be false and fraudulent. There is not a word of testimony in this record that services claimed in that invoice were not performed, i.e., bushhogging by Coleman supported by his invoice for services to H&O Materials. If then, Claim Number 1 was not shown to be false and fraudulent, then was it Claim Number 7, 18, 26 or 35? I submit that a reading of this record does not furnish the answer to any of those questions and it is certainly not shown by this record that Lum Cumbest knew that work claimed by Dale Coleman was not performed.
In Meridian City Lines v. Baker, 206 Miss. 58, 83, 39 So.2d 541, 545 (1949) this Court soundly condemned a general negligence instruction, stating:
The quoted instruction simply told the jury, in general terms, that it was the duty of the bus line to use reasonable care and caution in the operation of its buses so as to avoid injury to others, and it authorized the jury to find against the bus line if it believed from a preponderance of the evidence that a failure to exercise reasonable care proximately caused or contributed to the plaintiff's injury. By this instruction the jury was left to grope in the darkness, without any light to guide them, on the question of negligence of the bus line, and if in the nebulous maze of the wilderness the jury should grasp any act which it felt constituted a lack of reasonable care, it was authorized to adjudge the bus line guilty of negligence... .
It is axiomatic that if a jury must be given specific guidelines as to what they are looking for in negligence cases, it naturally follows that a jury in a criminal case must be likewise specifically instructed and guided in its deliberations.
If the defendant is not to be discharged, then justice and fair play demand that he receive a trial with a properly instructed jury.
BOWLING and SULLIVAN, JJ., join this dissent.
DAN M. LEE, Justice, dissenting:
A charge of fraud requires proof of an actual intent to deceive. That intent is a very difficult element of proof in many cases and, in my opinion, this is one of those cases. Because I believe the quality of proof was not sufficient to establish the requisite intent, I must respectfully dissent from the majority opinion.
The record in this case fails to reveal any intent on the part of Cumbest to defraud Jackson County. Certainly Vaughan and Coleman could have been found guilty of fraud for they were the parties who actually *244 manipulated and inflated the charges to the county. At best, though, the record only reveals that Cumbest is guilty of serious mistakes in judgment because he trusted Vaughan and Coleman. There is no proof that Cumbest knew of the fraud or benefited from it in any respect, only that his faith in Vaughan and Coleman allowed it to occur.
The majority opinion recognizes our holding in Pegram v. State, 121 Miss. 564, 83 So. 741 (1920), but fails to apply it here, which is the primary flaw in the opinion. In Pegram a member of the Tippah County Board of Supervisors was indicted for knowingly voting for payment of an unauthorized claim. We held:
There was no testimony whatever introduced from which the jury would have been justified in believing that the defendant in voting for the claim did so fraudulently or corruptly or through any bad faith. The testimony, taken most strongly for the state, only shows that the defendant in knowingly voting for this claim either did so through error or mistake of judgment. There is no testimony to show that the defendant in voting for the claim acted dishonestly. In fact, the testimony shows that he believed the board of supervisors had the power to pay this claim at that time. He was acting judicially.
In the case of Paxton v. Baum, 59 Miss. 531, in the opinion in chief on page 537 this court said:
"But, in view of the well-settled rule of the common law that for errors or mistakes a public officer acting judicially or quasi judicially is not liable, it could not have been the purpose of the Legislature to make members of boards of supervisors personally liable for errors or mistakes as to how to act in matters committed to such boards by law, and as to objects for which an appropriation of money is authorized to be made by them."
Again on page 539 in the opinion in response to the suggestion of error it is stated:
"Judicial officers of all grades are liable for their corrupt judgments. * * * But we cannot ignore the fact that supervisors, in the discharge of many of their functions, are judicial officers, and especially so in adjudicating upon the validity of claims against the county. A law which would make them personally liable for every erroneous judgment rendered, if constitutional, would certainly have the effect of preventing any solvent man from accepting the office, or of becoming the surety of those who did."

And more especially is this true if they are criminally liable for mistakes or errors of judgment in matters within their jurisdiction. This opinion concludes as follows:
"Manifestly, it is impossible, after we pass the point of corruption, to draw any line other than that laid down by us, namely, liability where the subject-matter of the appropriation is beyond the jurisdiction of the board; nonliability where the object is within the jurisdiction, but there has been a mistaken exercise of legal power. Within this limit, every case must depend upon its own facts." [121 Miss. at 578-579, 83 So. at 742]. (Emphasis added)
The circumstantial proof of Cumbest's intent to defraud is no better than that against Pegram. For that reason I would reverse.
Based on the foregoing, I respectfully dissent.
BOWLING and SULLIVAN, JJ., join this opinion.
NOTES
[1] The requisitions and receiving reports were handwritten. The record does not show who wrote them out. Coleman did sign them, however.
[2] Although Vaughan testified equipment rental included personnel to operate the machine, there were invoices in which hours for labor and a foreman were also charged. In any event, Vaughan did not simply lease a machine.
[3] Ocassionally H & O sold District 1 shells, fill dirt, but with no itemization of quantity or date furnished.
[4] There is no record of Vaughan's having any such contract, unless Cumbest was thinking of some work on a road. Even here, none of the minutes showing awarding a bid to H & O was introduced.
[5] The record shows one instance in which Cumbest signed the requisition and receiving report.
[6] Exhibits 2, 4, 6, 10, 11, and 14.
[7] Exhibits 24, 25, 26, 27, 35-A, 36, 37, and 38.
[8] Pertinent portions of the indictment are set forth in an appendix to this opinion.
[9] When Vaughan sat down with Cumbest each month to decide how much, and the manner to bill the county, he either (1) had some original records showing specific times, places, hours spent at each location, from which he was going to prepare an invoice, or (2) he kept all the information in his head.

The latter supposition is preposterous. If the former was the case, it is significant that none of these original records were ever produced.
[10] Cumbest approved one of them.
[11] Cumbest had the responsibility for examining and approving the claims at the board meetings, which he did.
[12] The only aspect of the matter Cumbest disputed was knowledge of Vaughan's disguise of bushhog rental under some other work. Cumbest never claimed Vaughan failed to tell him, or that he was unaware of the amount Coleman was charging H & O each month.
[13] No legal authority is cited in support of this argument.
[14] We are aware that in Pegram v. State, supra, a case in which there was no dishonesty shown on the part of a supervisor who voted for payment of claim, we stated that in order for a supervisor to be guilty under Miss. Code Ann. 19-13-36, fraud or corruption had to be proved. In Pegram we were not called upon to decide either the degree or magnitude of the "fraud or corruption" necessary to sustain a conviction under this section, because no dishonesty of any kind was shown. Nor, have we since Pegram been called upon to delineate the general statement we made in that decision.
[15] Although not necessary to our decision, we also note Miss. Code Ann. 19-13-35 could also be classified a "general" statute, just as Miss. Code Ann. 97-11-31.
[16] We are not intimating that even this conduct by law enforcement officers would necessarily prejudice a defendant.
[17] There were two other cases involving two separate defendants than Cumbest and Coleman, and in all cases a motion was made to quash because of pre-trial publicity. The trial judge heard all motions and received proof in their support in a single hearing.
[1a] His counsel still claims there was no showing that Jackson County did not get its money's worth. (P. 31, 3rd paragraph, Appellant's Brief)
[1] Smith v. State, 107 Miss. 486, 496, 65 So. 564, 567 (1914).